# 16-628(L)

16-628(CON), 16-639(CON), 16-640(CON), 16-641(CON), 16-642(CON), 16-643(CON),
16-644(CON), 16-649(CON), 16-650(CON), 16-651(CON), 16-653(CON), 16-657(CON),
16-658(CON), 16-659(CON), 16-660(CON), 16-661(CON), 16-662(CON), 16-664(CON),
16-665(CON), 16-666(CON), 16-667(CON), 16-668(CON), 16-669(CON), 16-670(CON),
16-671(CON), 16-672(CON), 16-673(CON), 16-674(CON), 16-675(CON), 16-676(CON),
16-677(CON), 16-678(CON), 16-681(CON), 16-682(CON), 16-683(CON), 16-684(CON),
16-685(CON), 16-686(CON), 16-687(CON), 16-688(CON), 16-689(CON), 16-690(CON),
16-691(CON), 16-694(CON), 16-695(CON), 16-696(CON), 16-697(CON), 16-698(CON)

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD.,

*Plaintiffs-Appellants,*

v.

REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

*(caption continued on subsequent pages)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

BANCROFT PLLC
500 New Jersey Avenue NW
Seventh Floor
Washington, DC 20001
(202) 234-0090

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant-Appellee The Republic of Argentina*

AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, BANCA ARNER S.A., BRANTFORD, HOLDING S.A., AURELIUS OPPORTUNITIES FUND II, LLC, FFI FUND, LTD., FYI LTD., NML CAPITAL, LTD., OLIFANT FUND, LIMITED, RICARDO PONS, OFELIA NELIDA GARCIA, NW GLOBAL STRATEGY, VIRGILIO LUIS FOGLIA, MARIA CRISTINA ARGENT BARNA, RICARDO AURELIO TRIAY, ADELA NOEMI JURI, TORTUS CAPITAL MASTER FUND, LP, HECTOR PEREZ, MARLAND INTERNATIONAL S.A., LIS CARINA MEDINA, M. ALEJANDRA TERRA RISSO, WITKRON S.A., GOLSUN S.A., JUAN ALBERTO JOSE, JOSE LUIS QUATRINI, MARIO ALBERTO RUIZ, FARIGOLD TRADE S.A., CLAUDIO MARTINEZ, FRANCISCO DE GAMBOA, SILVIA ALCIRA MURILLO DE GEBERT, ENRIQUE ANTONIO JULIO GEBERT, LAYNEL CORPORATION, LIVIO MAZZOLA, BRADFORD PROMOTIONS S.A., HAMBURG CONSULTING INC., PIERINO GARRAFA, CARLOS JESUS SENDIN, EDUARDO GIBSON, FRANCISCO BASSO, FRANCA ANTONIONE, FLORENCIO PEREZ, JUAN CARLOS GRECO, RAMON ZUBIELQUI, EDUARDO ANDRES FRANCHESCHI, GELLXON CORP., ENRIQUE COHEN, MARIA ISABEL BERRAONDO, GRACIELA ZUBASTI, ADOLFO SANCHEZ BLANCO, RAFAEL ANTONIO SALAMANCA, KINBURG TRUST S.A., MAZZINI, JORGE MARCELO, GRACIELA ALEJANDRA, COMPANIA CALITECNO S.A., ZUM FELDE, HEINRICH PETER BARAVALLE, ANA VALERIA, ALEJANDRO PABLO BARAVALLE, EZEQUIEL HERNAN BACLINI, PATRICIA RUTH CARONNA, JOSE ALBERTO LANDI, SALVADOR SADDEMI, MARIA TERESA LEPONE, HERNAN TABOADA, SUSANA FRASCA DE LAURIA, NORBERTO PABLO GIUDICE, SUSANA LAURIA, GUILLERMO DOTTO, JORGE MANUEL TABOADA, MARIA DEL CARMEN ESCUDERO, ROSAS DE COHEN, ESTRELLA BETY, CORBINS TRADE S.A., LUIGI GIACOMAZZI, LUCIANA PEDROLLI, PATRIZIA GIACOMAZZI, MICHELE STAGNITTO, CLAUDIO MIGUEL MATHEOU, HUGO MASINI, VIVIANA NOEMI TUORON, GUILLERMO JORGE DOMATO, IMPERIAL BYLIDOL S.A., DARIO ALBERTO PARDAL, PAULA MASTRONARDI, HORACIO ALBERTO VAZQUEZ, LILIANA CEBROWSKI, DIEGO PEDRO PELUFFO, JUAN OMAR GIOVACHINI, LILIA ANGELICA PARISI, TRALOVE COMPANY S.A., MAURA MALETTI, GRACIELA ADRIANA GAMITO, ADRIAN CALEFFA, GUILLERMO ALMANZA, FELICITAS C. VON GROMANN, ROBERTO VIRGILIO SAURO, RITA LESO, RODOLFO ALBERTO GIL, VICENCIO, VIVIAN ORIANA VICENCIO SAAVEDRA, FELICITAS FLORENCIA FOX ANASAGASTI, FRANCISCO EDUARDO DE LA MERCED, ISABEL EVANGELINA BAVASSI, MAKAPYAN S.R.L., FRANCISCO JOSE MECHURA, GRACIELA DONNANTUONI, BERNARDO G. FERMAN, FRANCAISE COMPAGNIE, D'INVESTISSEMENTS S.A., MARIA SUSANA PAGANO, CARLOS ALBERTO LAGOS, JULIO HECTOR KRASUK, MAZORAL S.A., MIGUEL LIMOLI, LUCIO RAMON MUR, JESUS JORGE OTANI, ALEJANDRO ENRIQUE FERNANDEZ, GUIDO DEBIASI, ATTILIO DE ROSA, MANUEL G. GUILLEN, BEATRIZ M. CASTANO, MONICA HAYDEE GRACIOTTI, LISANDRO ROBERTO ARTURO MORA, ABEL VICENTE SANTANA, MARIA CLAUDIA MANGIALAVORI, HORACIO ALBERTO M. SANC CABALLERO, RICARDO SANCHEZ CABALLERO, ELISA SANCHEZ CABALLERO, FIRST CITY S.A., JORGE JORACIO ROSINI, ALICIA ESTER SALVADOR,

DOLLY ESTHER CUBASSO, SANTA SORRENTINO, RODOLFO BURUL, LYDIA HAYDEE GIGAGLIA, ANSGAR NEUENHOFER, DORA RAQUEL MALEC, CLAUDIO OSCAR MAZZA, ADRIANA BEATRIZ POVEDA, ALBERTO SILVIO BURSZTYN, ANDREA FABIANA FUCITO, CARLOS ALBERTO LAGOS, MARIA DEL LAS MERCEDE LAGOS, MAURIZIO GIOVE, GUILLERMO CARLOS F. CENTENO, CARLOS ALBERTO MURACA, PATRIZIA VALERI, ANDREA RONZON, SILVA FALOMO, VITTORIO GIANNATTASIO, MONICA GIANNATTASIO, MARCELO EDUARDO PRIMA, RICARDO SANCHEZ CABALLERO, ELISA SANCHEZ CABALLERO, SUSANA MOLINA GOWLAND, THEA PINA GORGONE, ALESSANDRA PADOAN, GLORIA PADOAN, PIERLUIGI PADOAN, THEA PINA GORGONE, LUIGI PADOAN, MASSIMILIANO MAZZANTI, MANUELA MAZZANTI, GIUSEPPINA FUSCHINI, MARTA GUERRINI, CORRADO GUERRINI, STEFANIA SIMONCINI, LUIGI PACIELLO, LERINERCO S.A., AURELIO PESENTI, ARNOLDO DOLECETTI, TELLADE NAVA, TOMMASINO VITIELLO, LUIGI VITIELLO, GABRIELLE DOLCETTI, GUISEPPE DOLCETTI, PABLO HUGO KALBERMANN, EVA SONDERMANN GELLER, PEDRO KALBERMANN, INTER PALMISANO S.A., DORA RAQUEL MALEC, ANDREA SUSANA BURSZTYN, ALBERTO SILVIO BURSZTYN, ALFREDO PACHECO, FRANCES BROWN, ADOLFO MIGUEL MUSCHIETTI, JOSE ANTONIO MUSCHIETTI, MARIA CRISTINA BUENANO, ADOLFO MIGUEL MUSCHIETTI, MARIA CRISTINA BUENANO, RODRIGO FELIPE MUSCHIETTO, MARIA CRISTINA MUSCHIETTI, ALEJANDRO FEDERICO MUSCHIETTI, NELSON DANTE LUCIANO, DANTE LUCIANO, MERCEDES FELIU, DAVID ADRIAN LUCIANO, OSCAR PAUL CLAVIJO, ANA MARIA AURORA OTERO, CARLOS ALBERTO BRUZZONE, PEDRO KALBERMANN, EVA SONDERMANN, COLOMBO MASI, MARIA ELENA PELAYO, LUIS PEDRO BIVORT, VALENTINA ETCHART, MARIA FAUSTA CILLI, FIORENZO FACCIONI, LEONARDO HILARIO SIMONE, CARLOS ARTURO JOSE ULLA, PATRICIA STORARI, DECIO CARLOS FRANCISC ULLA, OSCAR SECCO, MERCEDES CALVO, DELFIN A. RABINOVICH, DIEGO PEDRO PELUFFO, ELVIRA DAGMAR BUZCAT, LEONIDAS RAUL BORDIGONI, ALEJANDRO FERNANDEZ BARBEITO, RAMON BARBEITO, LIDIA FERNANDEZ DE BARBEITO, MANUEL CALVO, MERCEDES CALVO, ALCIRA NOEMI ARDITI, CLAUDIO GABRIEL ARDITI, FERNANDO BARBEITO FERNANDEZ, SANDRO CONCETTINI, MARIA ASUNCION INMACU CASTELLI, JOSEFA AMBROSELLI, ROBERTO CARLOS PARADA, ROSA SARA POMPEYA LA DE PARADA, GUILLERMO PEDRO PARADA, MARIANO ROBERTO PARADA, ALICIA G. DE SONDERMANN, EVA SONDERMANN, SUSANA SONDERMANN, RICARDO SONDERMANN, PAULA ARMANDA AZCARATE, EDITH ELVIRA NICOLAS, FISEICO, - FINANCIAL SERVICES INTERNATIONAL CORPORATION, ENSENADA UNITED CORPORATION, LORENZO BIANCHI, GIORDANO ALLIEVI, GABRIELLA TOSCANO, AMBROGIO STUCCHI, GIUSEPPE STUCCHI, MARIA LUISA STUCCHI, MORENO LEGNARO, MARIO DAL TOE, DAVIDE CIALLELLA, BRAMANTE DAL TOE, LUCIA VETTORETTI, ALDO NAJ OLEARI, MARIA IDA MODENA, ADA DAL TROZZO, LUIS GARCIA TOBIO, ANTONIA MIRIAN MACIEL, KAZIMIERZ KORNAS, LUIGI GIACOMAZZI, LUCIANA PEDROLLI, AGOSTINO SCOCCHERA, MARCELO

SPILLER, ROMINA MARIA BUSCAGLIA, NORA RAQUEL LOPEZ, GABRIEL MIGUEL, RAMON MIGUEL, MARCOS VANNI, ANA ANTONIA CABRERA, TERENCIANO DE JESUS CABRERA, CARLOS ALBERTO MARTINEZ, MONICA CRISTINA BARBERO, SIDNEY SUTTER, EDUARDO ARGENTIERI, CARLOS ADOLFO ESCATI, ARMANDO EDUARDO VALERIO, MIRTA ANTONIA PORTELA, ROQUE PEREZ VILLALBIA, GABRIEL FEDRICO LEIMGRUBER, FEDERICO HECTOR LEIMGRUBER, LAURA VICTORIA DEMIDOVICH, ALEJANDRO DEMIDOVICH, DIEGO WALTER CASTRILLI, DANIEL HORACIO ROLFO, ALICIA EVELIA GALIANI, SILVIA MABEL SACCONE, MARCELO RUBEN RIGUEIRO, ALFREDO ENRIQUE ZUCCHINI, NESTOR DE NICOLA, GRACIELA MARTA BERRETTI, PAULA DE NICOLA, SANTIAGO ROCCA, ANA MARIA SALDANA, ENRIQUE JORGE ROCCA, JOSEF SCHWALD, DENISE MARIE LAURETTE COLELLA, MICHELLE COLELLA, SUSANA LEONOR GATTI, MARTA BEATRIZ GATTI, LUIS ANGEL GATTI, GRISELDA TERESA DULEVICH, MARIA AGUSTINA SAUCO, MARIA GRISELDA SAUCO, MARIA FLORENCIA SAUCO, OSVALDO LORENZO SAUCO, ANGELA BUSI, RAMON EDUARDO NEBHEN, ANA CECILIA ALBORNOZ, BRUNO ITALIA, RUBEN UBALDO DI MARCO, MARIA LUCRECIA QUIROGA, JORGE ALBERTO ATILIO NEGRI, NICOLAS CARLOS AMADOR FARINOLA, JORGE CORADO FARINOLA, RENATE ARNOLD, IRMA HAYDEE REDONDO DE NEGRI, MASSIMO BALDARI, LILLINA ROSSO, ALBERTO ANICETO GONZALEZ, DELIA ISABEL GONZALEZ, MARIANA GONZALEZ, ROBERTO FEDECOSTANTE, DINA DI TOMMASO, BRIGIDA ELVIRA DENIS, VILMA BURGIO, NAIBY ELIANA SORIA, MARIA MARTA DE LUCA, ALEXANDER STERN, NELIDA AMELIA GIUSTI DE BEHAR, INGEBORG STERN, SERGIO RODOLFO BERRI, STELLA MARIS BOFFELLI, MALCOLM GERALD BERRI, NELIDA ROSA PAOLINI, FRANCO MARIA CONTE, LINA LO VULLO, FRANCESCO MASSOLETTI, DIANA KLEIN, FERISMAR CORP. S.A., CARLOS A. RIAL COTO, MARIA C. UNGARO TORRADO, COUNTY BAY INVESTMENTS LTD., GHIBLI INVESTMENTS LTD., SILVIO EDUARDO SAUCO, MIGUEL KAUFMANN, EDGARDO A. RAMOS, RIVKA SCHMUSKOVITS DE SCHUSTER, NICOLAS SCHUSTER, FLAVIA MARINA SCHUSTER, BEATRIZ LEONOR DE RAMOS, JORG ZAHN, ELENA PASQUALI, PORTICO CAPITAL INC., HARTMUT PETERS, SABINE ZAHN, WOLFGANG BOLLAND, BLIWAY INTERNATIONAL S.A., RICARDO KAUFMANN, MIGUEL ANGEL BITTO, MARIA SILVIA CINQUEMANI, EUGENIO QUARTRINI, OLGA ALBA MARINI, SEBASTIAN QUATRINI, PEDRO MARCELO SEXE, SAMUEL OLDAK, ANNA OLDAK, DAVID OLDAK, URI OLDAK, TELINCOR S.A., SOCRATE PASQUALI, ANNA MARIA CARDUCCI, NORFOLK INVESTMENT TRADE CO. LTD., GAMETOWN CORPORATION, NORBERTO ANGEL GARCIA MADEO, ANA MARIA SAENZ, GRACIELA CANDIDA CORLEIS SAENZ, WEGE ZU MOZART VERANSTALTUNGSGESEKKSCHAFT M.B.H, BOIM S.A., STEFANO SPANICCIATI, NESTOR ALBERTO RUBIN, ANDREAS WILFRED SCHWALD, ANTONIO JUAN PAULETICH, FABIAN E. PAULETICH, FRANCO PERUZ, NORBERTO DARIO CASTELLA, STREET INVESTMENTS LIMITED, GUIDO SCANAVINO, LYDIA SCANAVINO, GIANCARLO GRASSI, HENDRIK BEYER, EDGARDO GERARDO A. SCLAFANI, LUCIA RAFAELA TASSO, ALEXIA BRANDES, FERNANDO

EXPOSITO, MARA CAVANA, MAURIZIO DALLA, RENATO PALLADINI, ANDREA VIGNALI, FINCOMPANY S.A., GLORIA GAGGIOLO, VALERIO CHIRIATTI, SIMONETTA BUCCIOLI, ATTILIO GAUDENZI, LORIS ZAVOLI, ELENA MARCACCINI, ILDEBRANDO MOTTI, TULLIA TURCHI, CARLO CIGOLINI, JUAN EDUARDO COLUMBO, ESTELA ISABEL DELGADO, CARLA NANNI, MAURIZIO PETRONI, ROBERTO AKMAN, LILIANA EDITH GENNI, ARNOLDO DOLCETTI, MARCELLA DOLCETTI, LUCA MULAZZANI, ROBERTO BAUTISTA FRANCO BACCANELLI, ALFREDO CARLOS ALZAGA, MIGUEL ALBERTO BALESTRINI, BIBIANA DELLA FLORA, MARIA ISABEL BALESTRINI, MARIANA NOEMI TAUSS, ALEJANDRO R. LUPPI, ATILIO LUIS POCOSGNICH, ALICIA BEATRIZ GRACIAN, CAROLINA POCOSGNICH, BEATRIZ MARTI RETA, HORACIO TOMAS LIENDO, LUCIANA CEREDI, LUCIANO MILANESI, ALESIA MILANESI, PENG ZEYING, WOON CHEUNG LEUNG, RAUL ALEJANDRO GONZA MARTIN, GUSTAVO CARLOS FERREIRA, JOSE EMILIO CARTANA, RAUL HORACIO MENDEZ, MARIA MERCEDES MENDEZ FERRO, ROBERTO CLAUDIO PITRONA ELLE, ALBERTO GUILLERMO HILLCOAT, ELENA GRACIELA MARTINEZ, ENRIQUE SEBASTIAN PALAC MINETTI, SEBASTIAN JORGE PALACIO, MARIA ESTHER FERRER, AJU S.A., CASIMIRO KORNAS, MICHAEL HEEB, LIDIA FLORINDA PIOLI, ANA LIDIA LEIVAS, JUAN DOMINGO BALESTRELLI, GUNTHER BRAUN, HWB RENTEN PORTFOLIO PLUS, HWB ALEXANDRA STRATEGIES PORTFOLIO, NW GLOBAL STRATEGY, VICTORIA STRATEGIES PORTFOLIO LTD., HWB VICTORIA STRATEGIES PORTFOLIO, HWB PORTFOLIO PLUS, CESARE DE JULIIS, MIRTA BEATRIZ MANDOLINO, EDUARDO HECTOR SORROCHE, SUSANA ALICIA COSTA, DIEGO MARCOS SORROCHE, VERONICA SORROCHE, CHRISTA ERB, RUDOLF ERB, SILVIA BEATRIZ OVEJERO, DAVID DE LAFUENTE, JOSE L. PELUSO, HWB ALEXANDRIA STRATEGIES PORTFOLIO, ZYLBERBERG FEIN LLC, U.V.A. VADUZ, KLAUS BOHRER, AMBER REED CORP., CONSULTORA KILSER S.A., MICHAEL SCHMIDT, MARIE LAURETTE DUSSAULT, BURGHARD PILTZ, OSCAR REINALDO CARABAJAL, DORA LUISA SASAL, UTE KANTNER, SUSANA ALICIA MONKES, ALBERTO HABER, ALEJANDRO ALBERTO ETCHETO, CRISTA IRENE BRANDES, FRANCISCO MIGUEL MOLINARI, HELMUT HAGEMANN, HWB DACHFONDS-VENIVIDIVICI, HWB GOLD & SILBER PLUS, ROSA DELFINA CASTRO, GAMETOWN CORPORATION S.A., CRISTOPH HAGEMANN, DRAWRAH LIMITED, MICHELE COLELLA, DENISE DUSSAULT, ANYE SALINOVICH, DEBORA REINA COHEN, FEYSOL S.A., VANINA ANDREA EXPOSITO, BEATE NEUENHOFER, LERINERCO S.A., ANDREA DE NICOLA, INES DELIA EIDELMAN, DIEGO FABIAN TOPF, MODERN GROUP S.A., LUCABRAS S.A., CESAR CIVETTA, ALDO CIVETTA, AMANDA WIELIWIS, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, MAXIMO DORRA, OLGA DE DORRA DORRA, ANGEL EMILIO MOLINOS, RAUL RENNELLA AND SANDRA

ELIZABETH SCHULER, ANA ZEMBORAIN ZEMBORAIN, MIGUEL ANGEL BELOQUI, HORACIO GUIBELALDE, MARTA MABEL FOLGADO, ARAG-A LIMITED, ARAG-O LIMITED, ARAG-V LIMITED, ARAG-T LIMITED, GRAZIANO ADAMI, GIANFRANCO AGOSTINI, MILENA AMPALLA, ALLAN APPLESTEIN TTEE FBO DCA GRANTOR TRUST, AUGUSTO ARCANGELI DE FELICIS, ANTONELLA BACCHIOCCHI, ALBERTO BACIUCCO, OTELLO BACIUCCO, FILIPPO BAGOLIN, SARA BARTOLOZZI, ANNELIESE GUNDA BECKER, SERENELLA BELLEGGIA, GIORGIO BENNATI, ROBERTO BERARDOCCO, GRAZIELLA BERCHI, ORSOLINA BERRA, ADRIANO BETTINELLI, MASSIMO BETTONI, STEFANO BISTAGNINO, GIORGIO BISTAGNINO, GRAZIELLA BONADIMAN, ANDREA BONAZZI, STEFANIA BONPENSIERE, RACHELE BONTEMPI, MARCO BORGRA, SERGIO BORGRA, RENATA BOSCARIOL, EMANUELE BOTTI, CARLO BRETTI, SUSANNA BRETTI, ANTONIETTA GUISEPPINA BRIOSCHI, MARCELLO CALANCA, BRUNO CALMASINI, ITALIA CAMATO, GIUSEPPINA CAPEZZERA, LAURA ANNA CAPURRO, VINCENZO CARBONE, CARIFIN S.A., GIOVANNI CARLOTTA, ELETTRA CASALINI, DIEGO CASTAGNA, MARCO CAVALLI, CARMELINA CENSI, GIAN FRANCESCO CERCATO, ALBERTO COMPARE, GIOVANNA CONNENA, AGOSTINO CONSOLINI, CESARINO CONSOLINI, MARIA LUIGIA CONTI, SILVANA CORATO, GIANCARLO BARTOLOMEI CORSI, FRANCESCO CORSO, GIUSEPPINA CORSO, LAURA COSCI, ANGELO COTTONI, MONICA CROZZOLETTO, GRAZIELLA DACROCE, TARCISIA DALBOSCO, ALDO DAVID, ANTONIO DE FRANCESCO, ANTONELLA DE ROSA KUNDERFRANCO, MANUELA DE ROSA KUNDERFRANCO, EUFROSINA DE STEFANO, ADRIANA DELL'ERA, CARLO FARIOLI, ANNA FERRI, GIOVANNA FERRO, FRANCESCO FOGGIATO, DONATELLA ZANOTTI FRAGONARA, RINALDO FRISINGHELLI, ANGIOLINO FUSATO, GABRIELE FUSATO, FELICINA GAIOLI, MADDALENA GAIOLI, GIAN CARLO GANAPINI, FRANCESCO MAURO GHEZZI, MARIO GIACOMETTI, GIOVANNI GIARDINA, CELESTINO GOGLIA, GIULIA GREGGIO, VERNA GUALANDI, LUISELLA GUARDINCERRI, GIANFRANCO GUARINI, RAIMONDO IALLONARDO, INNOVAMEDICA S.P.A., FKA MATIVA S.R.I., MARITZA LENTI, ANGELO LEONI, PAOLO LISI, UGO LORENZI, SERGIO LOVATI, FERNANDA ANGELA LOVERO, CARMELO MAIO, CLAUDIO MANGANO, ELIDE MARGNELLI, CARLA MARINI DE FELICIS ARCANGLI, ROMANO MARTON, MIRCO MASINA, GUGLIELMINA MASSARA, BRUNA MATTIOLI, SALVATORE MELCHIONDA, MASINA MIRCO MIRCO, SIMONETTA MONTANARI, GIAMPAOLO MONTINO, CARLA MORATA, ALESSANDRO MORATA, MARIA RITA MORETTO, AMATO MORI, BRUNO PAPPACODA, SABRINA PARODI, ALFREDO PELLI, FRANCO PEZZE, VALERIO PIACENZA, PERI LUIGI LUCIBELLO PIANI, EUGENIA RE, ALEESSANDRA REGOLI, BARBARA RICCHI, MARIA ROBBIATI, PAOLA ROSA, ADRIANO ROSATO, GIUSEPPE SILVIO ROSSINI, LAURA ROSSINI, RAFFAELE ROSSINI, RUGGERO ROSSINI, INES ROTA, HILDA RUPPRECHT, VINCENZA SABATELLI, ANGELINA SALMISTRARO, TIZIANO SASSELLI, MARINELLA SCALVI, MAURIZIO SERGI, SIMONA STACCIOLI, LICIA STAMPFLI-ROSA, SANTE STEFANI, ANNA STORCHI, STUDIO LEGALE BENNATI, RENATE TIELMAN, MANUELITO TOSO, VALERIA TOSO,

Franco Trentin, Stefania Trentin, Martino Verna, Mario Vicini, Luca Vitali, Vito Zancaner, Giovanni Zanichelli, Matteo Zanichelli, Trinity Investments Limited, Egar Ramon Lambertini, Ana Doratelli, Scoggin Capital Management Ii LLC, Juana Bonaiuti, Scoggin International Fund Ltd., Scoggin Worldwide Fund Ltd., Tito Siena, Mcha Holdings, LLC, Attestor Master Value Fund LP, Armando Ruben Fazzolari, Julio Roberto Perez, White Hawthorne, LLC, Jose Pedro Angulo, Pedro Timoteo Angulo, Fernando Crostelli, Juan Carlos Crostelli, Martina Crostelli, Viviana Crostelli, Patricio Hansen, Claren Corporation, Bybrook Capital Master Fund LP, Bybrook Capital Hazelton Master, Fund LP, Andrarex, Ltd., Claridae Ltd, Maria Del Pilar De We Ferrer, Stonehill Institutional Partners, LP, Stonehill Master Fund Ltd.,

*Plaintiffs-Appellants,*

Giovanni Botti, Claudio Mori, Silvia Regoli,

*Plaintiffs,*

v.

Bank Of America, N.A.,

*Respondent,*

Banco Bilbao Vizcaya Argentaria, S.a., Bbva Compass Bancshares, Inc., Bbva Securities Inc.,

*Third-Party Defendants,*

Administracion Nacional De Seguridad Social, Union De Administradoras De Fondos De Jubilacions Y Pensiones, Consolidar AFJP S.A., Arauca Bit AFJP S.A., Futura AFJP S.A., Maxima AFJP S.A., Met AFJP S.A., Origenes AFJP S.A., Profesion+AUGE AFJP S.A., Unidos S.A. AFJP,

*Defendants.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ............................................................1

COUNTERSTATEMENT OF ISSUE PRESENTED ...............................4

COUNTERSTATEMENT OF THE CASE...............................................4

    A.    Argentina's Economic Crisis and Restructuring...................................4

    B.    The "Holdout" Bondholder Litigation ...............................................5

        1.    The 2012 pari passu injunctions ...................................5

        2.    The appeals of the pari passu injunctions ...................................7

        3.    Appointment of the Special Master ...........................................9

        4.    The 2015 "me too" injunctions ...................................10

    C.    The Election of President Macri and the New Government's Change of Course .......................................................10

    D.    The Republic's Motion to Vacate the Injunctions .............................13

    E.    The District Court's Indicative Ruling...............................................14

    F.    Settlement with "Lead Plaintiffs" ....................................................17

    G.    The District Court's Order Granting the Republic's Motion.............19

    H.    Events Following the District Court's Order ....................................20

SUMMARY OF ARGUMENT .............................................................22

ARGUMENT .....................................................................................26

i

I.    THE DISTRICT COURT ACTED WELL WITHIN ITS BROAD
      DISCRETION IN ORDERING CONDITIONAL VACATUR OF
      THE INJUNCTIONS BASED ON CHANGED CIRCUMSTANCES
      THAT HAD SHIFTED THE BALANCE OF EQUITIES. ......................... 26

      A.    The Decision to Vacate the Injunctions, Like the Decision to
            Enter Them, Is Committed to the District Court's Sound
            Discretion. ................................................................................ 27

      B.    The District Court's Factual Finding of Changed Circumstances
            Was Firmly Supported by the Record and Not Clearly
            Erroneous. ................................................................................ 32

            1.    The district court correctly found that Argentina has shown
                  a good-faith willingness to negotiate with holdouts. ............... 33

            2.    The district court correctly found that the Republic had taken
                  meaningful steps toward repealing legislative obstacles to
                  settlement. ................................................................. 35

            3.    The district court correctly found that the Republic has
                  entered into settlement agreements in principle with the
                  vast majority of plaintiffs. ........................................... 36

      C.    The District Court Did Not Abuse Its Broad Discretion in
            Concluding That the Balance of Equities (Including the Public
            Interest) Had Shifted in Favor of Conditionally Vacating the
            Injunctions. ................................................................................ 38

            1.    The district court did not abuse its discretion in concluding that
                  changed circumstances had rendered the Injunctions
                  inequitable. ................................................................. 39

            2.    The district court did not abuse its discretion in concluding that
                  the public interest favors vacating the Injunctions. ................. 46

II.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
      VACATING THE INJUNCTIONS UPON THE OCCURRENCE OF
      CONDITIONS PRECEDENT. ...................................................... 47

ii

III.   THE PARI PASSU CLAUSE DOES NOT REQUIRE THE
       CONTINUED IMPOSITION OF EXTRAORDINARY EQUITABLE
       RELIEF IN THE FACE OF CHANGED CIRCUMSTANCES...................53

       A.    Equitable Relief Is Not an Entitlement of Parties Aggrieved by
             Breach of Contract.................................................................53

       B.    The Pari Passu Clause Does Not Require That All Bondholders
             Be Treated the Same in All Circumstances.........................................54

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
       DECLINING TO ENTERTAIN THE DISINGENUOUS
       "CLARIFICATION" PROPOSED BY "LEAD PLAINTIFFS." .................56

CONCLUSION .....................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbo-Bradley v. City of Niagara Falls*,
293 F.R.D. 401 (W.D.N.Y. 2013) ....................................49

*Advance Pharm., Inc. v. United States*,
391 F.3d 377 (2d Cir. 2004) .........................................51

*Aevoe Corp. v. AE Tech Co., Ltd.*,
727 F.3d 1375 (Fed. Cir. 2013) ....................................58

*Aurelius Capital Master v. Argentina*,
No. 14-2689, Doc. 167 (2d Cir. Sept. 19, 2014) ...............58

*EM Ltd. v. Banco Cent. de la República Argentina*,
800 F.3d 78 (2d Cir. 2015) ..........................................42

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) .........................................53

*Grace v. Rosenstock*,
228 F.3d 40 (2d Cir. 2000) ..........................................28

*Great-West Life & Annuity Ins. v. Knudson*,
534 U.S. 204 (2002).....................................................27

*Gwozdzinsky v. Magten Asset Mgmt.*,
106 F.3d 469 (2d Cir. 1997) .........................................48

*HMI Mech. Sys. v. McGowan*,
No. 99-CV-376 (FJS), 2000 U.S. Dist. LEXIS 21231
(N.D.N.Y. Mar. 8, 2000)..............................................50

*Horne v. Flores*,
557 U.S. 433 (2009)........................................15, 27, 31, 32

*In re Terrorist Attacks on Sept. 11, 2001*,
741 F.3d 353 (2d Cir. 2013) .........................................32

iv

*King-Seeley Thermos Co. v. Aladdin Indus.*,
   418 F.2d 31 (2d Cir. 1969) ...............................................................30

*Lewis v. Rahman*,
   147 F. Supp. 2d 225 (S.D.N.Y. 2001) ..............................................50

*McPherson v. Homeward Residential*,
   No. C12-5920 (BHS), 2013 WL 4498695
   (W.D. Wash. Aug. 21, 2013) .............................................................50

*N.Y. State Ass'n for Retarded Children v. Carey*,
   706 F.2d 956 (2d Cir. 1983) ..............................................................31

*NML Capital, Ltd. v. Republic of Argentina*,
   699 F.3d 246 (2d Cir. 2012) .........................................................passim

*NML Capital, Ltd. v. Republic of Argentina*,
   727 F.3d 230 (2d Cir. 2013) .........................................................passim

*NML Capital, Ltd. v. Republic of Argentina*,
   No. 08 Civ. 06978 (TPG), 2012 WL 5895786
   (S.D.N.Y. Nov. 21, 2012) ..................................................................53

*Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*,
   324 U.S. 806 (1945) ..........................................................................58

*Rufo v. Inmates of Suffolk Cnty. Jail*,
   502 U.S. 367 (1992) ..........................................................................31

*Salazar v. Buono*,
   559 U.S. 700 (2010) ..........................................................................32

*Semmes Motors v. Ford*,
   429 F.2d 1197 (2d Cir. 1970) ............................................................49

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   732 F.2d 253 (2d Cir. 1984) ..............................................29, 30, 31

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*,
   364 U.S. 642 (1961) ..................................................................28, 31

*Texas v. United States*,
   523 U.S. 296 (1998) ..........................................................................59

v

*United States v. Affectionate Heart in Home Care*,
   No. 14-cv-2106 (ELH), 2014 WL 4953748 (D. Md. Sept. 8, 2014).................50

 *United States v. Diapulse Corporation of America*,
   457 F.2d 25 (2d Cir. 1972) ...................................................................49

*United States v. Eastman Kodak Co.*,
   63 F.3d 95 (2d Cir. 1995) ....................................................................31

*United States v. LoRusso*,
   695 F.2d 45 (2d Cir. 1982) ...................................................................28

*United States v. McGinn*,
   787 F.3d 116 (2d Cir. 2015) .................................................................59

*United States v. Philip Morris USA Inc.*,
   686 F.3d 839 (D.C. Cir. 2012)..............................................................58

*Winter v. NRDC*,
   555 U.S. 7 (2008)..........................................................................27, 53

**Statutes & Rules**

Fed. R. Civ. P. 54 .....................................................................................28, 29

Fed. R. Civ. P. 60(b)(5)..................................................................................29

Fed. R. Civ. P. 60(b)(6)..................................................................................29

Fed. R. Civ. P. 62.1 .......................................................................................13

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, Federal Practice and
   Procedure § 2942 (3d ed. 2015)....................................................27, 28

Ross P. Buckley, *The Bankruptcy of Nations:  An Idea Whose Time Has
   Come*, 43 Int'l Law. 1189 (2009) .........................................................5

## PRELIMINARY STATEMENT

After more than a decade of intractable litigation between Argentina and the holders of its defaulted bonds—to the point that this Court branded the Republic a "uniquely recalcitrant debtor"—an "historic breakthrough" has placed this case on the path to settlement. As the district court found in exercising its broad discretion, the Republic's new administration has committed to resolving this dispute once and for all, as an essential part of a far-reaching package of reforms. Argentina's dramatic change of course has resulted in settlements with the vast majority of bondholders and good-faith settlement proposals to the remaining claimants. What had proven impossible for years is now within reach— an amicable resolution to the hostile dispute that followed Argentina's 2001 default.

A critical precondition to that resolution, however, is this Court's expeditious affirmance of the district court's order providing for the vacatur—upon the occurrence of certain conditions precedent—of the extraordinary injunctions it entered against the Republic in November 2012 and October 2015. Those injunctions were never intended to be a final resolution of the plaintiffs' claims. Instead, they were designed to address what the plaintiffs and the district court viewed as the Republic's intransigence and "unprecedented, systematic scheme" to pay other debts without paying the plaintiffs here.

The injunctions worked. In the order under review, the district court—which has presided over dozens of suits against the Republic for more than a decade and has unparalleled expertise regarding the facts and circumstances of this case—concluded that "circumstances have changed so significantly as to render the injunctions inequitable and detrimental to the public interest." The court accordingly granted the Republic's motion to vacate all the injunctions subject to two readily ascertained conditions: (1) the removal of all legislative obstacles to settlement by the Argentine Congress and (2) the Republic's actual payment of settlements agreed to by February 29, the day before Congress reconvened to take up the proposal.

The district court's thoroughly reasoned decision falls comfortably within its equitable discretion. As the court found, now that the Republic has returned to the bargaining table to negotiate in good faith with the plaintiffs, the injunctions are not only unnecessary but affirmatively counterproductive and inequitable. The continued force of the injunctions precludes Argentina from accessing the global capital markets to raise funds needed to complete the settlements because global investors will not be able to count on Argentina's authority to repay. The Argentine legislature also has made authorization of the settlement agreements, and the capital raise to finance them, contingent on affirmance of the district court's order. And because most settlements are

2

conditioned on vacatur of all injunctions, affirming the district court's order is the only way to prevent the few remaining holdouts from exploiting the injunctions as leverage at the expense of the settling plaintiffs, Argentina's other creditors, and the 40 million people of the Republic who desperately need to close the book on a troubled chapter in their history.

In the face of these overwhelming equitable considerations and the district court's indisputable discretion to vacate its own injunctions, the plaintiffs quibble about procedural mechanics and second guess factual findings. None of this comes close to showing an abuse of the district court's equitable discretion. There is nothing unusual, let alone improper, about an injunctive remedy that is lifted upon the satisfaction of conditions precedent. And the district court's factual findings are more than amply supported by the record, which shows that the Republic's newly elected administration has promised concrete action to facilitate the resolution of this litigation, and has followed through on that promise.

\*               \*               \*

Whatever considerations might have supported extraordinary injunctive relief against the Republic in the past, the equities have decisively shifted in favor of resolving this long-running and bitter dispute. And as the district court recognized, time is of the essence, because some settlements might fall through if payment is not made by a certain date. What the district court once

3

had the power to decree in order to alter behavior and incentivize good-faith

settlement negotiations, it manifestly has the power to relieve now that the

behavior has changed and settlement is within reach.  The district court's prudent

exercise of its broad discretion should be affirmed expeditiously in all respects.

## COUNTERSTATEMENT OF ISSUE PRESENTED

Did the district court abuse its broad equitable discretion in

conditionally vacating the interim injunctions it had entered against the Republic

based on its findings that "circumstances have changed so significantly as to render

the injunctions inequitable and detrimental to the public interest"?

## COUNTERSTATEMENT OF THE CASE

### A.    Argentina's Economic Crisis and Restructuring

In 2001, Argentina suffered the worst economic crisis in its modern

history, causing poverty and unemployment to reach unprecedented levels.  Unable

to pay its debt and provide basic services, the Republic declared a payment

moratorium on more than $80 billion of external debt, including bonds it had

issued in 1994 pursuant to a Fiscal Agency Agreement ("FAA Bonds").  In the

wake of this default, the cumulative fall in economic output was almost twice that

experienced by the United States during the Great Depression.  "The living

standards of over one-half of the Argentine people fell below the poverty line, and

4

over a third could not afford basic food." (Ross P. Buckley, *The Bankruptcy of Nations: An Idea Whose Time Has Come*, 43 Int'l Law. 1189, 1196 (2009).)

There is no bankruptcy regime for sovereign nations; instead, a sovereign in crisis must engage in voluntary restructuring of its debt. (*Id.* at 1189-91.) As part of its restructuring, Argentina in 2005 and 2010 offered holders of defaulted FAA Bonds new "Exchange Bonds," which had a face value of about 30% of the face value of FAA Bonds. (SPA-22.) In connection with the exchange, the Argentine Congress enacted the so-called "Lock Law," which prohibited the Republic from making any payment or settlement with respect to unexchanged debt. (*Id.*) Approximately 93% of FAA Bonds were exchanged for Exchange Bonds. After issuing the Exchange Bonds, the Republic began making payments on the Exchange Bonds, but did not resume payment on the FAA Bonds. (*Id.*)

### B. The "Holdout" Bondholder Litigation

#### 1. The 2012 *pari passu* injunctions

Plaintiffs-appellants are FAA Bondholders who declined both exchange offers and instead sued Argentina for payment. They brought claims for breach of contract, initially seeking damages for unpaid principal and interest on the defaulted bonds.

In October 2010, plaintiffs in 13 actions (the "*pari passu* actions") also moved for injunctive relief, invoking the "equal treatment" provision of the "*pari passu*" clause of the FAA, which provides: "The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness." (A-482.)

The plaintiffs in the *pari passu* actions made clear that the injunctive relief they requested was not intended to operate as a final resolution of the dispute or a permanent encumbrance on the Republic. Instead, they contended that the proposed injunctions could enable bondholders "to pursue a global resolution of Argentina's debts arising from the FAA" and that, with the injunctions in place, "Argentina may at long last conclude that it must put an end to its standoff with all of its aggrieved bondholders." (No. 08 Civ. 6978, Doc. 361 at 4.) Plaintiffs noted that, in a different sovereign debt case, "after the District Court entered an order that was the functional equivalent of the Proposed Order here, the Republic of the Congo chose to settle with the plaintiff." (*Id.* at 18 n.8.)

On February 23, 2012, the district court exercised its equitable discretion to craft injunctions "to address the Republic's steadfast refusal to pay plaintiffs anything." (SPA-49-50.) As plaintiffs had suggested, the injunctions did not purport to constitute a final resolution of this case; the district court expressly

reserved jurisdiction "to modify and amend" the injunctions "as justice requires to achieve [their] equitable purposes and to account for changing circumstances." (A-538.)  Nor did the injunctions order the Republic to pay the plaintiffs the full amount due on their bonds.  Instead, the injunctions provided that whenever the Republic made a payment on the Exchange Bonds, it also had to make a "ratable payment" to plaintiffs.  (A-535-36.)

In issuing its February 23, 2012 order, the district court made certain findings that are particularly relevant to this appeal.  *First*, the district court found that there was "no adequate remedy at law . . . because the Republic has made clear—indeed, it has codified in [the 'Lock Law']—its intention to defy any money judgment issued by this Court."  (A-534.)  *Second*, in analyzing the "balance of the equities," the district court found that "equitable relief is particularly appropriate here, given that the Republic has engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations [under the FAA]."  (*Id*.)

## 2.    The appeals of the *pari passu* injunctions

The Republic appealed the *pari passu* injunctions, contending that the district court erred in entering such extraordinary relief in a contract action against a foreign sovereign.  Before this Court, plaintiffs defended the district court's decision on the basis that "[i]t is difficult to conceive of any case in which

7

deference to the discretion of the district court is more appropriate than it is here," where "[t]he same district judge [had] presided over dozens of similar lawsuits against Argentina for more than [a] decade[]" and had "in-depth familiarity with the parties, counsel, and facts, and . . . [with] virtually every development in the evolving disputes arising from Argentina's 2001 default." (Case No. 12-105-cv(L), Doc. 308 at 70.)

This Court agreed, finding that there was "no such abuse of discretion in the injunctive relief fashioned by the district court." *NML Capital, Ltd. v. Republic of Arg.*, 699 F.3d 246, 250 (2d Cir. 2012) ("*NML I*"). This Court explained that "[t]he performance required by a decree need not . . . be identical with that promised in the contract." *Id.* at 261. Accordingly, "[o]nce the district court determined that Argentina had breached the FAA and that injunctive relief was warranted, the court had considerable latitude in fashioning the relief" and could impose an equitable remedy that it believed "achieve[d] a fair result under the totality of the circumstances." *Id*.

In response to a limited remand, the district court issued an order revising the injunctions in the *pari passu* actions to clarify how the "ratable payment" requirement was to operate. (SPA-1-8.) This Court affirmed, again finding that the district court had not abused its discretion. *NML Capital v. Argentina*, 727 F.3d 230, 238 (2d Cir. 2013) ("*NML II*"). In particular, the Court

8

held that it was not an abuse of discretion to require a "ratable" payment because "a court empowered to afford equitable relief may also direct the timing of that relief." *Id.* at 241. The Supreme Court denied certiorari.

### 3. Appointment of the Special Master

To underscore its belief that the injunctions were an interim measure and that ultimate resolution could come only through settlement, the district court in June 2014 appointed Daniel A. Pollack, Esq. "as Special Master to conduct and preside over settlement negotiations between and among the parties to this litigation." (A-593.) The district court instructed the parties "to give full cooperation to the Special Master in all respects in the negotiations and to provide the Special Master promptly with any and all information he may appropriately request and any and all logistical assistance which he may request." (A-594.)

For the next year and a half, Argentina refused to participate in settlement discussions under the auspices of the Special Master. Instead, the prior government urged that the Special Master be removed because of his alleged "overt bias in favor of the vulture funds."[1] On multiple occasions, the district court expressed its frustration with the Republic's refusal to seek a negotiated resolution.

---

[1] *See* Press Release, Ministry of Economy and Public Finance, *available at* http://www.embassyofargentina.us/en/for-the-benefit-of-vulture-funds-judge-griesa-continues-without-resolving-anything.html.

9

(*See, e.g.*, No. 08 Civ. 6978, Doc. 762 at 14 ("The court urges the Republic, once
again, to avail itself of the Special Master's services."); No. 08 Civ. 6978, Doc.
778 at 16:4-5 ("I hope the Republic at long last will be willing to negotiate.").)
The court also repeatedly expressed its view that this dispute could be resolved
only through settlement.  (*See, e.g.*, A-578 ("it is through settlement that
obligations which need to be honored can be honored; therefore, it is highly
important that settlement negotiations go forward and bear fruition"); A-602
("[T]he settlement is what has got to come somehow, some day.").)

### 4.     The 2015 "me too" injunctions

On October 30, 2015, the district court entered similar injunctions in
49 actions brought by the so-called "me too" plaintiffs (collectively with the *pari
passu* injunctions, the "Injunctions").  (SPA-9-34.)  In issuing the 2015 injunctions,
the district court found that the balance of equities favored plaintiffs for largely the
same reasons the court had found in issuing the initial injunctions in 2012.  (SPA-
28-31.)  The court also cited "[t]he Republic's reluctance to entertain meaningful
settlement discussions before the Special Master" and echoed this Court's
statements that Argentina had been a "uniquely recalcitrant debtor."  (SPA-30.)

### C.     The Election of President Macri and the New Government's Change of Course

On November 22, 2015, Argentina elected Mauricio Macri as its
President.  President Macri campaigned on an agenda of economic reform, and a

10

central part of his reform package is to resolve this dispute with the Republic's creditors and restore the Republic's access to global capital markets, which will directly benefit its people. (A-666-67.)

President Macri acted swiftly to implement his agenda. He called for the Argentine Congress to repeal the Lock Law and other legislative impediments to settlement when it reconvened on March 1. And he immediately dispatched senior officials to New York to engage in settlement discussions with plaintiffs under the supervision of the Special Master. (A-642; A-666-67.) On February 3, 2016, after weeks of intense negotiations, the Republic reached settlements in principle with two of the largest bondholders, providing for payment of over $1 billion and the resolution of five of the Injunction cases. (*See* A-717-21.)

Two days later, the Republic published a proposal to settle with the holders of all defaulted debt (the "Proposal"). (A-645-49.) The Proposal, if accepted by all plaintiffs with Injunctions, would result in cash payments of approximately $6.5 billion. (A-668-69.) The Proposal contemplates two frameworks for settlement. The "Standard Offer," which is open to all FAA bondholders, whether or not they have Injunctions, provides for payment equal to 100% of the principal amount of the bond plus up to 50% of that original principal as interest. (A-668.) The "*Pari Passu* Offer," which is extended as an option to plaintiffs holding Injunctions, provides for payment equal to the full amount of a

11

money judgment or an accrued claim value less a discount of 30%.[2]  (*Id*.)  The terms set forth in the Proposal remain open today and do not have an expiration date.

The Special Master publicly described the Proposal as "an historic breakthrough."  (A-642.)  He recognized the "courage and flexibility" of President Macri and Minister of the Economy Alfonso Prat-Gay "in stepping up to and dealing with this long-festering problem which was not of their making," noting that the Republic's "team worked around the clock to facilitate the negotiations." (*Id*.)  U.S. Treasury Secretary Jacob Lew similarly expressed support for the Proposal, commending "Argentina's good faith efforts to resolve this long-standing dispute" and echoing the Special Master's "strong hope that all creditors will be able to resolve their differences and reach Agreements in Principle with Argentina."  (A-651.)

Following the issuance of the Proposal, the Republic continued to negotiate with large and small bondholders, reaching additional settlements that

---

[2] For those who reached settlements by February 19, 2016, this discount was reduced to 27.5%.  (A-668.)

ranged from less than $1 million to more than $100 million.  (*See* A-1670, A-1957-2015).[3]

### D.    The Republic's Motion to Vacate the Injunctions

On February 11, 2016, the Republic moved in the district court to vacate the Injunctions.  (A-450-59.)  Because the me too injunctions were then on appeal, the Republic also moved in those cases for an indicative ruling pursuant to Federal Rule of Civil Procedure 62.1.  (A-6331-76.)

The Republic did not ask the district court to vacate the Injunctions immediately.  Rather, the Republic requested that the Injunctions be vacated upon the occurrence of two important and clearly defined conditions precedent:  (i) that the Republic repeal the Lock Law and related legislation that now prevents the Republic from making settlement payments to plaintiffs; and (ii) that the Republic make payment in full to any parties who reached settlements by February 29, 2016,

---

[3] After entering into agreements in principle with VR Global Partners, L.P. and Procella Holdings, L.P., the Republic determined that those agreements provide for payments with respect to certain claims that are time-barred.  The Republic asked those parties, in the interest of fairness, to amend the agreements to remove payments related to time-barred claims, but they refused.  On February 29, 2016, the Republic mistakenly included in the list of settlements provided to the district court that it had reached an agreement in principle with Red Pines LLC.  In fact, while Red Pines signed a form of agreement, which it submitted to the Republic on February 28, 2016 (*see* A-2017-25), the Republic subsequently determined that the submitted agreement provided for payment with respect to claims that are time-barred.  The Republic therefore did not countersign the agreement.

13

the day before the March 1 submission of the matter to the Argentine Congress. (A-452; A-6344.)

The Republic's motion was supported by several plaintiffs, as well as a large group of Exchange Bondholders who had not been able to receive payment for nearly two years as a result of the Injunctions. Plaintiffs EM Limited and Montreux, which between them had settled for over $1.1 billion, explained that their settlement was contingent on lifting the Injunctions and that vacatur was therefore essential to the Injunctions' underlying purpose: promoting a global resolution to the dispute between the Republic and the holdout bondholders. (A-675-76, 679-80, 689-90, 697.) The Exchange Bondholders explained that their previous "substantial financial sacrifices"—exchanging their FAA bonds for a fraction of face value—are "the very reason why the Republic's considerably more lucrative settlement offer to the [holdout FAA bondholders] is even possible" and asked that their undisputed right to be paid not be further delayed by plaintiffs' "disproportionate negotiating leverage." (A-1712-14.)

### E. The District Court's Indicative Ruling

On February 19, 2016, the district court issued an Indicative Ruling in the me too actions providing that, if this Court were to remand those cases, the district court would grant the Republic's motion to vacate. (SPA-35-69.) The district court explained that "[t]he injunctions, once appropriate to address the

14

Republic's recalcitrance, can no longer be justified" and that "[s]ignificantly changed circumstances have rendered the injunctions inequitable and detrimental to the public interest." (SPA-59.)

   The district court's conclusion that changed circumstances had shifted the equities was based upon three key factual findings. *First*, and "[m]ost importantly," the district court found that "the Republic has shown a good-faith willingness to negotiate with the holdouts," as evidenced by senior officials' engagement in extensive and productive talks before the court-appointed Special Master. (SPA-59-62.) That engagement, the district court found, marked a dramatic shift from the Republic's earlier refusal to hold talks with its bondholders and its show of "open contempt for this court's rulings." (*Id.*) "Put simply," the district court emphasized, "President Macri's election changed everything." (*Id.*)

   *Second*, the district court found that "[t]he Republic's self-imposed conditions—repealing legislative obstacles and paying settlements in full— represent a 'dramatic shift in policy' that justifies vacating the injunctions." (SPA-61-62 (alteration omitted) (quoting *Horne v. Flores*, 557 U.S. 433, 461 (2009).) The court explained that "[j]ust as the Republic's conduct in 2012 and 2015 influenced the court's decision to issue the [Injunctions], so too must the court consider the Republic's present behavior." (*Id.* at 62.) The result of these changes, the court concluded, was that "[t]he balance of equities has shifted." (*Id.*)

15

*Third*, the district court found the fact that "a number of plaintiffs have now agreed in principle to settle" to be "another changed circumstance [that] significantly alters the equities." (SPA-63.) The court expressed concern that "[i]f the court refused to vacate the injunctions, it would unfairly deny those [settling] plaintiffs the opportunity to resolve their disputes amicably with the Republic." (*Id.*) In other words, the "court cannot countenance an equitable remedy that would allow plaintiffs to hold other plaintiffs hostage." (SPA-68-69.)[4]

The district court also concluded that vacating the Injunctions "would serve the public interest by ceasing the collateral effects they have on third parties," including the Exchange Bondholders and settling plaintiffs. (SPA-64-65.) Because many plaintiffs had settled subject to the condition that *all* Injunctions be vacated, leaving some injunctions in place would allow non-settling plaintiffs to "scupper" the deals reached by settling plaintiffs. (SPA-65.)[5] The court made clear that it "never intended this result." (*Id.*) In addition, the district court found that vacating the Injunctions and "[a]llowing the Republic to reenter the capital

---

[4] Notably, the district court made that finding *before* the NML plaintiff group, who hold roughly 65% of the bonds at issue, reached their $4.6 billion settlement with the Republic.

[5] Indeed, because the Injunctions, while issued across numerous non-consolidated cases, all impose the same restrictions on the Republic that are not specific to any individual action, it only makes sense that the Injunctions be vacated across all cases.

markets will undoubtedly help stimulate its economy and thus benefit its people."
(SPA-66.)   Finally, the court concluded that "vacating the injunctions serves the
public interest by encouraging settlement to resolve disputes generally—
particularly such protracted ones—as well as the concern for finality in this
particular litigation."  (*Id*.)

### F.    Settlement with "Lead Plaintiffs"

Following the district court's issuance of the Indicative Ruling, the
Republic continued to negotiate settlement agreements with bondholders, including
large hedge funds, smaller funds, and individual bondholders.  (A-652-70.)

On February 29, 2016, under the supervision of the Special Master,
the Republic reached an agreement in principle with the largest bondholders and
primary proponents of this longstanding litigation, including NML, Aurelius,
Olifant and Blue Angel, to resolve their claims for approximately $4.653 billion
(the "NML Agreement").  (No. 08 Civ. 6978 (TPG), Doc. 913.)  Among other
provisions, the settlement gives the self-styled "lead plaintiffs" the option to
terminate the agreement if the Republic does not make payment by April 14.
(A-2371.)  The NML Agreement represents "about 65% of the claims at issue in
this litigation."  (Aurelius Br. at 1.)  That agreement followed weeks of intense
negotiations, including extensive communication between the Special Master and
the Chairman of NML, Paul Singer.  (A-1920-21.)  In a public statement, the

17

Special Master described the settlement as a "giant step forward in this long running litigation" and noted that "fortunately, both sides to this epic dispute finally saw the need to compromise, and have done so." (*Id.*) The Special Master described the Republic's "course correction" as "nothing short of heroic." (A-1921.)

The next day, March 1, 2016, President Macri addressed the Argentine Congress on the first day of its new session. He asked it to repeal the legislative obstacles to settlement, and announced that "now it depends on this Congress to end the 15-year conflict . . . I'm confident that responsibility will win over rhetoric."[6]

By the time of President Macri's address, the Republic had reached settlements with plaintiffs representing the vast majority of claims in these cases for consideration of approximately $6.2 billion. (A-1939.) Those settlements "resolv[e] over 85% of the claims of those with '*pari passu*' and 'me-too' Injunctions." (A-1921; *see also* A-2327.)

---

[6] *See Recap: The Key Points of President Macri's Speech to Congress*, The Argentina Independent, Mar. 2, 2016, http://www.argentinaindependent.com/currentaffairs/analysis/the-key-points-of-president-macris-speech-to-congress.

### G.   The District Court's Order Granting the Republic's Motion

After the district court issued the Indicative Ruling, the Republic moved this Court to remand jurisdiction over the me too actions to the district court.  The Republic also moved to voluntarily dismiss all pending appeals related to the Injunctions.  Counsel for the Republic explained that the new government was "abandoning the substantive arguments against the imposition of the original injunctions" (A-1816), an extraordinary step given that the Republic had previously fought the Injunctions all the way to the Supreme Court.

This Court remanded to the district court, which held a hearing at which 15 attorneys presented argument.  On March 2, 2016, the district court entered an order granting the Republic's motion to vacate the Injunctions subject to the conditions precedent.  (SPA-70-84.)  In the order, the district court incorporated its findings from the Indicative Ruling, and noted three subsequent developments that further supported vacatur.  *First*, the Republic had reached settlement agreements "with plaintiffs representing the vast majority of claims in these actions . . . . at least $6.2 billion, potentially resolving over 85% of claims held by plaintiffs with injunctions."  (SPA-83.)  *Second*, the Republic had "abandoned all former challenges to the injunctions by voluntarily dismissing with prejudice the two appeals pursued by the Republic's prior administration, thus showing a completely changed attitude."  (*Id*.)  *Third*, President Macri had

19

addressed Congress on its first day in session "to urge approval of settlements in this litigation—an important step toward fulfilling a condition of this order." (SPA-83-84.)

The court noted that "vacating the injunctions in no way impedes the settlement negotiations now taking place" and that it "expects the Republic to continue to negotiate with the remaining non-settling plaintiffs." (SPA-82.) But the court reiterated that "injunctive relief cannot be allowed to be used as a tool for leverage in negotiations," and stressed that "[t]here is a pressing need for certainty and finality" given the ongoing debate in the Argentine legislature and the April 14 payment date in the NML Agreement. (SPA-82-83.)

## H.    Events Following the District Court's Order

Following President Macri's address to Congress, the administration introduced a bill to remove the legislative obstacles to settlement and authorize the government to resolve this dispute. The bill repeals the Lock Law and other legislation that would interfere with payment of the settlements. In addition, subject to this Court affirming the district court's conditional vacatur of the Injunctions, the bill (a) ratifies the agreements in principle executed to date; (b) authorizes the government to continue to negotiate settlements with any remaining bondholders without prior approval of Congress; and (c) authorizes a

20

capital raise of up to \$12.5 billion.[7]  On March 15, 2016, the bill passed the House

by a vote of 165 to 86.[8]  The bill is expected to reach the Senate floor on March 30.

On March 16, Minister Prat-Gay appeared in the Senate, where he testified for over

five hours in support of the bill.[9]

Meanwhile, the Republic has continued to negotiate with plaintiffs

whose claims remain unresolved.  On March 4, ten additional bondholders reached

settlements worth approximately \$6.7 million.[10]  On March 9, seven individual and

institutional bondholders reached settlements worth over \$190 million.[11]  On

March 18, 115 individual bondholders, holding \$155 million of defaulted bonds,

---

[7] The bill also reinstates Bank of New York Mellon as the Republic's fiduciary agent.

[8] Laura Serra, *Con aporte opositor, el Gobierno tuvo un contundente éxito en Diputados*, La Nación (Mar. 17, 2016), http://www.lanacion.com.ar/1880461-con-aporte-opositor-el-gobierno-tuvo-un-contundente-exito-en-diputados.

[9] Gustavo Ybarra, *El Gobierno se acerca a la mayoría en el Senado por los holdouts*, La Nación (Mar. 17, 2016), http://www.lanacion.com.ar/1880457-el-gobierno-se-acerca-a-la-mayoria-en-el-senado-por-los-holdouts.

[10] Statement of Special Master, March 4, 2016, http://www.prnewswire.com/news-releases/statement-of-daniel-a-pollack-court-appointed-special-master-march-4-2016-300231251.html.

[11] Statement of Special Master, March 9, 2016, http://www.prnewswire.com/news-releases/statement-of-daniel-a-pollack-court-appointed-special-master-march-9-2016-300233604.html.

reached settlements.[12]  A number of those bondholders then moved to withdraw their appeals.[13]

## SUMMARY OF ARGUMENT

**I.**     By any measure, the district court's entry of interim injunctive relief against a foreign sovereign in a contract matter was extraordinary.  But this Court affirmed that relief based on the district court's broad discretion to balance the equities, including the public interest, in crafting a remedy for what the courts perceived to be the Republic's unprecedented intransigence as embodied in a refusal to negotiate and passage of the Lock Law.  Now, however, in light of dramatic and demonstrable changes in the Republic's approach to this dispute, the same district court has reexamined the equities and concluded that they tip decisively in favor of lifting the Injunctions.

The order below, conditionally vacating the district court's own Injunctions, falls well within the district court's broad discretion and should be affirmed.  Simply put, the Injunctions are no longer needed and, indeed, have become affirmatively counterproductive.  The Republic has replaced its longstanding recalcitrance with active efforts to resolve this dispute.  Those efforts

---

[12] *See* Statement of Special Master, March 18, 2016, http://www.prnewswire.com/news-releases/argentina-settles-with-115-individual-bondholders-holding-155-million-in-defaulted-bonds-300238220.html.

[13] *See* Case Nos. 16-662-cv, Doc. 75; 16-670-cv, Doc. 77; 16-675-cv, Doc. 91.

have produced tangible results, as the Republic has taken steps toward repealing the legislation that prompted the Injunctions and also has reached agreements in principle with the holders of more than 85% of the outstanding bonds. Under these circumstances, leaving the Injunctions in place would pose a serious *obstacle* to settlement, both because the final holdouts could exploit the Injunctions as leverage against the Republic at the expense of the settling plaintiffs, and because the Injunctions prevent the Republic from raising in the global markets the capital needed to fund those settlements. Moreover, the district court correctly concluded that lifting the Injunctions would advance the public interest by allowing the Republic to resume payments to the Exchange Bondholders, strengthening the Argentine economy, and promoting the resolution of sovereign debt disputes more broadly.

Appellants do not seriously dispute the district court's factual findings, but instead contend that only "exceptional circumstances" could justify vacatur of the Injunctions. That argument is particularly unpersuasive coming from litigants who have extolled the district court's broad equitable discretion for years. It is also an inaccurate statement of the governing law. Because the Injunctions were never intended to operate as a *final* resolution of the parties' dispute, the district court has the same discretion to vacate the Injunctions as it did to enter them in the first place. The court correctly found both that modifying the

23

Injunctions was equitable and that leaving them in place would be inequitable. That was not remotely an abuse of discretion.

II.     Certain plaintiffs also contend—for the first time on appeal and without any support in this Court's case law—that the district court's decision to lift the Injunctions subject to conditions precedent constituted procedural error. That argument is both forfeited and wrong on the merits.  Indeed, "lead plaintiffs'" position is puzzling given that the conditions precedent—repeal of the Lock Law and full payment of settlement agreements entered on or before February 29—are designed to *protect* settling parties like them.  The sensible conditions adopted by the district court here are comfortably within its ample discretion to craft equitable relief.  Nor is there anything uncommon or improper about tying the vacatur of an injunction to satisfaction of conditions precedent, even if the injunction is dissolved automatically once those conditions are met.  That is especially true here, where nothing will prevent any plaintiff from returning to the district court to seek the re-imposition of equitable relief in the unlikely event that future circumstances warrant it.

III.    Some appellants who have not yet reached agreements with the Republic contend that the *pari passu* clause itself requires maintenance of the Injunctions.  That position is based on a misinterpretation of both the clause and the Injunctions.  As this Court has explained, the Injunctions provide a remedy for

24

the Republic's longstanding refusal to engage with bondholders, but they do not purport to enforce the *pari passu* clause directly. And nothing in the clause creates an affirmative entitlement to injunctive relief (indeed, equitable relief in *any* contract case is the exception, not the rule). Now that the Republic's approach has changed starkly, it was well within the district court's discretion to conclude that the Injunctions have effectively achieved their purposes and may be dissolved upon satisfaction of the conditions precedent.

IV. Finally, "lead plaintiffs" devote a considerable portion of their brief to asking this Court to address a hypothetical question about the operation of the district court's order in response to potential future developments. The district court prudently exercised its discretion in declining to issue that proposed "clarification," and the question is not properly before this Court. Beyond that, however, the "clarification" they seek makes little sense. What they contend, in essence, is that if they back out of their settlement by exercising a unilateral contractual termination right, Argentina would still have to pay them $4.6 billion to satisfy the payment condition in the district court's order, because the terminated and void settlement had, once upon a time, been entered into by the February 29 deadline. That argument is meritless and, if considered at all, should be rejected.

\*         \*         \*

25

This bitter dispute has gone on long enough, and the appropriate time for relief is now.  Affirmance by this Court is necessary to the legislative reforms required from the Argentine Congress and to the capital markets financing required to fund these settlements.  Without affirmance, there can be no settlements, and the great progress of the past few months will be wasted.  In short, the district court's orders lie well within its discretion and should be expeditiously affirmed.

## ARGUMENT

## I.  THE DISTRICT COURT ACTED WELL WITHIN ITS BROAD DISCRETION IN ORDERING CONDITIONAL VACATUR OF THE INJUNCTIONS BASED ON CHANGED CIRCUMSTANCES THAT HAD SHIFTED THE BALANCE OF EQUITIES.

The legal question in this appeal is straightforward:  whether the district court abused its broad discretion in conditionally vacating the Injunctions that it had previously entered as a remedy for what it perceived as Argentina's extraordinary intransigence.  The answer is clearly that the district court acted well within its broad discretion; its decision to vacate its own Injunctions was based on factual findings of changed circumstances that are not subject to serious dispute and a balancing of equities that the court was uniquely well-suited to undertake.

Tellingly, plaintiffs' arguments do not center on *whether* the Injunctions should be vacated, but rather *when*, and under what circumstances.  Some plaintiffs contend that the district court should have waited until more plaintiffs had settled, or that it should have deferred ruling for 30 days, or that the

26

Republic first should have settled with *them* (on terms other than those deemed acceptable to many other bondholders large and small). But it was up to the district court to weigh the equities of each of those suggestions, and it was well within the district court's discretion to conclude that the equitable approach was to set up a carefully structured path toward final resolution of this dispute. The plaintiffs do not come close to showing that the court's reasoned exercise of its equitable discretion should be disturbed.

### A. The Decision to Vacate the Injunctions, Like the Decision to Enter Them, Is Committed to the District Court's Sound Discretion.

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). That is particularly true when the party to be enjoined is a public official or sovereign government. *See Horne*, 557 U.S. at 448-50; 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2942 (3d ed. 2015). Moreover, equitable relief is traditionally unavailable in a contract action "to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation." *Great-West Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 210-11 (2002).

Nevertheless, interim injunctive relief may be ordered in a contract action against a foreign sovereign "where no adequate monetary remedy is available and that relief is favored by the balance of equities, which may include

27

the public interest." *NML I*, 699 F.3d at 261.  Once a district court has concluded that injunctive relief is warranted, the court has "considerable latitude in fashioning the relief." *Id.*  Among other things, the court may "direct the timing of that relief." *NML II*, 727 F.3d at 241.

      Consistent with its broad discretion over equitable remedies, a district court that enters an injunction "possesses inherent power" to modify or vacate that injunction.  *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982).  The district court's authority to modify an injunction "is a necessary concomitant of the prospective operation of equitable relief and has its roots in the historic power of chancery to modify or vacate its decrees as events may shape the need."  Wright & Miller §2961; *see Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961).  "[A] district court always retains the power to adjust the terms of an injunction as unforeseen problems or complexities . . . present themselves." *NML II*, 727 F.3d at 246.

      District court authority to modify injunctions is embodied in several provisions of the Federal Rules of Civil Procedure.  Rule 54(b) provides that "any order . . . however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b); *see Grace v. Rosenstock*, 228 F.3d 40, 51

28

(2d Cir. 2000). And Rules 60(b)(5) and 60(b)(6) provide that a court may grant relief from a final order, including an injunction, if "applying it prospectively is no longer equitable" or for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5), (b)(6); *see Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984).

The Injunctions at issue here are interim injunctions subject to revision under Rule 54(b) because they "adjudicate[] fewer than all the claims or the rights and liabilities of fewer than all the parties." In particular, they are orders that grant carefully targeted relief for the Republic's alleged breach of the *pari passu* clause and prior extraordinary conduct, but they do not purport to resolve plaintiffs' claims for damages for the Republic's failure to make payments on their bonds. Nor were the Injunctions ever intended to provide a full and final resolution of the parties' entire legal dispute. (*See* SPA-117-18 ("For years, the court has repeatedly recognized that the only viable way to end this litigation is through settlement—surely for less than the full claim, as the notion of 'settlement' implies.").)

Plaintiffs themselves recognized at the time the Injunctions were issued that they were never intended to provide final relief. *See, e.g.*, Case No. 08 Civ. 6978, Doc. 369 at 11 n.4 ("NML is not seeking an injunction aimed at collecting a judgment, but is requesting specific performance of the equal

29

treatment promise that Argentina made").  Indeed, plaintiffs previously argued that this Court had jurisdiction to review the Injunctions as interlocutory orders, rather than final decisions, noting that "claims for principal and interest on the FAA bonds remain outstanding."  Case No. 12-105-cv(L), Doc. 308 at 6.  Moreover, the Injunctions themselves explicitly provide that the court may "modify and amend [them] as justice requires to achieve [their] equitable purposes and to account for changing circumstances."  (SPA-7; *see also* SPA-59.)  Thus, to justify modifying the Injunctions, the district court "need only have applied the same discretion as it had originally."  *Sierra Club*, 732 F.2d at 257.

Even if the Injunctions were considered final, the standard for modification is not nearly as rigid as plaintiffs suggest.  *See* NML Br. at 32 (contending that the Republic must demonstrate "exceptional circumstances").  No less an authority than Judge Friendly has decried an approach to reviewing modification of injunctions characterized by excessive "rigidity" and requiring "drastic changes in conditions."  *King-Seeley Thermos Co. v. Aladdin Indus.*, 418 F.2d 31, 34 (2d Cir. 1969).  And plaintiffs' lead authority, *Sierra Club*, clearly states that "in the case of a final or permanent injunction, the inquiry on appeal is whether there has been *such a change in the circumstances as to make modification of the decree equitable*."  732 F.3d at 257 (emphasis added).  Moreover, this Court has made clear that "modification of the decree" can be

30

considered "equitable" (*id.*) even if the "purpose of the decree" is not fully achieved, *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995).

Accordingly, little turns on whether this Court considers the Injunctions interlocutory measures subject to revision under Rule 54 or final orders subject to modification under Rule 60 because "applying [them] prospectively is no longer equitable." A district court has "wide discretion" to modify a permanent injunction under Rule 60. *Sys. Fed.'n No. 91*, 364 U.S. at 647-48; *see N.Y. State Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983) (Friendly, J.) ("[t]he power of a court of equity to modify a decree of injunctive relief [under Rule 60(b)(5)] is long-established, broad, and flexible"). In exercising that discretion, a district court may vacate or modify an injunction when there has been "a significant change either in factual conditions or in law." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992); *see also Sierra Club,* 732 F.2d at 256. Vacatur or modification of an injunction may also be warranted "when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.

A "flexible approach" to modifying injunctive relief is especially appropriate when an injunction encumbers public officials of a sovereign government. *Horne*, 557 U.S. at 450. Courts must ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its

31

officials" and must avoid "improperly depriv[ing] future officials of their designated legislative and executive powers." *Id.* Indeed, modifying an equitable remedy in response to changed circumstances is not merely optional; "a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Id.* at 447; *accord Salazar v. Buono*, 559 U.S. 700, 714-15 (2010) (plurality opinion) (courts "must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an instrument of wrong").

### B. The District Court's Factual Finding of Changed Circumstances Was Firmly Supported by the Record and Not Clearly Erroneous.

This Court reviews a district court's decision to enter, modify or vacate an injunction for abuse of discretion, and reviews any factual findings for clear error. *See In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013); *accord* NML Br. at 25. The ultimate showing of an abuse of discretion can be made only when "(1) [the district court's] decision rests on an error of law or a clearly erroneous factual finding; or (2) cannot be found within the range of permissible decisions." *Id*.

The district court's conclusion that changed circumstances had shifted the equities that once supported the Injunctions—and that the Injunctions were no longer equitable and should be conditionally vacated—was based on several

32

factual findings that were firmly supported by the record.  None of those findings even comes close to constituting clear error.

### 1. The district court correctly found that Argentina has shown a good-faith willingness to negotiate with holdouts.

The district court's first and "[m]ost importan[t]" factual finding of changed circumstances was that "the Republic has shown a good-faith willingness to negotiate with the holdouts."  (SPA-59.)  There is no serious dispute that this finding was correct.  All parties agree that, at the time the Injunctions were issued, the Republic's official policy was that it would not take *any* steps to resolve its dispute with plaintiffs.  *See, e.g.*, NML Br. at 10.

But "President Macri's election changed everything."  (SPA-59.) Shortly after taking office, President Macri dispatched senior finance officials to New York, who engaged in around-the-clock efforts to reach settlements with the Republic's bondholders.  *See* NML Br. at 11 ("To his credit, days after his election, President Macri announced his intention to negotiate a resolution to these long-pending actions.").   And, in addition to its many one-on-one negotiations with bondholders—no small feat given their dispersion around the world—the Republic published a global settlement proposal that can be accepted by anyone with a valid claim.  Indeed, a number of plaintiffs have resolved their actions in this way.  (*See* A-1957-2025.)

33

A few plaintiffs complain that Argentine officials have not met with them individually. *See, e.g.*, Andrarex Br. at 22. But it was hardly necessary for the Republic to meet with every single plaintiff one-on-one to support a finding of significant changed circumstances. In all events, the district court found as a factual matter (with the benefit of reports by the Special Master, as well as his public statements) that "claims made by certain plaintiffs that they have had 'no opportunity' to negotiate are exaggerated." (SPA-82.) As explained by the Undersecretary of Finance in sworn declarations, the Republic disputes assertions made by some individual bondholders that they lacked an opportunity to negotiate—senior Argentine government officials tried to initiate conversations with counsel for those parties multiple times without receiving a response. (A-1940.)[14]

---

[14] Undersecretary of Finance Santiago Bausili further stated, "on January 13, 2016, Luis Caputo, Argentina's Secretary of Finance, and Eugenio Bruno, counsel to the Argentine Ministry of Treasury and Public Finance, met at the office of the Special Master with Michael Spencer of Milberg LLP . . . [who is] counsel to numerous plaintiffs . . . . On February 4, 2016, Mr. Spencer again met with Secretary Caputo at the office of the Special Master. That meeting was also attended by Mario Quintana, Vice Chief of the Argentine Cabinet, the Special Master, and principals for certain other plaintiffs. I personally exchanged emails with Mr. Spencer on February 28, 2016, and we are scheduled to speak today, February 29, 2016." (A-1940.) In addition, on March 18, 2016, Mr. Spencer withdrew two appeals (Nos. 16-675-cv and 16-662-cv), because, seemingly unbeknownst to him, his clients had reached agreements in principle to settle. *See* No. 16-628-cv(L), Docs. 385, 388. Those plaintiffs clearly were not denied a meaningful opportunity to engage with the Republic regarding settlement.

34

The public settlement proposal issued by the Republic also applies to all plaintiffs, and the district court expressly found that this proposal "remains open." (SPA-82.) By any fair measure, the district court's most important factual finding—of Argentina's good-faith willingness to negotiate—was correct.

## 2. The district court correctly found that the Republic had taken meaningful steps toward repealing legislative obstacles to settlement.

The district court's second finding of changed circumstances was that the Republic had taken meaningful steps toward repealing legislative obstacles to settlement. Again, the change is both dramatic and undeniable. As this Court previously observed in affirming the Injunctions, "Argentina's executive declarations and legislative enactments" prevented even the possibility of settlement with plaintiffs. *NML I*, 699 F.3d at 260. But the Republic's new administration not only committed to seeking repeal of the legislative obstacles to settlement, but also affirmatively asked the district court to make repeal a condition precedent of vacating the Injunctions. (*See* SPA-61-62 ("The Republic's self-imposed conditions—repealing legislative obstacles and paying settlements in full—represent a 'dramatic shift in policy' that justifies vacating the injunctions.") (alterations omitted).) And President Macri has delivered on his promise to seek legislative change, personally urging the Argentine Congress on its first day in session after his election to repeal the Lock Law and related measures. In response

35

to that message, the Congress acted in swift and dramatic fashion by passing the required bill in the lower house on March 15. The bill is now scheduled to be taken to the Senate next week.

Some plaintiffs question whether the Argentine Congress will actually enact the proposed legislation. *See* Arag-A Br. at 45. Of course, there is no way to answer that question with certainty. But President Macri's strong advocacy of the repeal bill, combined with its passage by one house of the Argentine legislature, surely suffice to support the district court's finding of changed circumstances. In all events, as the district court explained, the conditions precedent in the vacatur order ensure that the Injunctions will not be lifted *unless and until* the Argentine legislature completes the repeal, so any objections based on uncertainty about the repeal bill's fate are beside the point.

### 3. The district court correctly found that the Republic has entered into settlement agreements in principle with the vast majority of plaintiffs.

The district court's third factual finding of changed circumstances was that the Republic has entered into settlement agreements in principle with the vast majority of plaintiffs. (SPA-83-84.) Like the district court's other findings, this change in circumstances is both beyond dispute and highly significant. At the time the Injunctions were issued, the Republic refused to discuss settlement or pay *anything* to holders of defaulted FAA bonds. But it is now undisputed that the

36

Republic has reached voluntary resolutions of more than 85% of outstanding claims, which will result in more than $6.2 billion in payments. That progress continues to this date, as just last week 115 individual bondholders, holding $155 million of defaulted bonds, reached settlements with the Republic and withdrew their appeals.[15]

Despite those dramatic developments, some plaintiffs dispute the district court's finding because *they* have not yet been able to reach a settlement with the Republic. *See*, *e.g.*, Individual Bondholder Br. at 25-27. But that assertion falls well short of suggesting clear error. The district court did not base its Injunctions on the Republic's failure to settle with *all* of the plaintiffs; it based its Injunctions on the Republic's refusal to engage in meaningful settlement discussions with *any* of the plaintiffs. (*See* SPA-50.) And it would make no sense as a matter of law or logic to establish a 100% settlement rate as the threshold for finding changed circumstances. To do so would not only be practically unworkable but would also turn the Injunctions into "a tool for leverage in negotiations" that obstructs rather than promotes settlement. (SPA-83.)

---

[15] *See* Statement of Special Master, March 18, 2016, *available at* http://www.prnewswire.com/news-releases/argentina-settles-with-115-individual-bondholders-holding-155-million-in-defaulted-bonds-300238220.html.

Some of the remaining bondholders have tried to seek settlement with respect to bonds that are outside the statute of limitations period and thus not the basis for valid claims. But Argentina need not ignore what it believes are legal bars to certain claims in order to show significantly changed circumstances. In all events, there is no need for this Court to wade into disputes about the merits of the discrete claims of individual bondholders, particularly disputes that have not been brought before the district court and are not before this Court on appeal. Whatever disagreements might exist with respect to the increasingly small fraction of bonds not yet subject to settlement, the fact remains that the Republic has reached settlements in principle to resolve the vast majority of the outstanding claims.

**C. The District Court Did Not Abuse Its Broad Discretion in Concluding That the Balance of Equities (Including the Public Interest) Had Shifted in Favor of Conditionally Vacating the Injunctions.**

Based on its findings of changed circumstances, the district court concluded that the balance of equities, including the public interest, had shifted in favor of conditionally lifting the Injunctions. Although the Injunctions had been entered to *promote* a resolution of this long-running dispute and advance the public interest, the court found that leaving the Injunctions in place at this point would *preclude* resolution and harm the public interest. That conclusion was correct and does not come close to constituting an abuse of discretion.

38

1.   **The district court did not abuse its discretion in concluding that changed circumstances had rendered the Injunctions inequitable.**

The changes in circumstances found by the district court—the Macri Administration's diligent efforts to resolve this litigation, the Republic's meaningful steps toward repealing legislative obstacles to settlement, and the settlement of more than 85% of the claims through agreements in principle— thoroughly undermine the equitable premises that once supported the Injunctions. The Injunctions were entered at a time when the Republic was steadfastly refusing to resolve this dispute, was making payments on other indebtedness, and was making clear that it would refuse to pay these plaintiffs anything.  Under those circumstances, the Injunctions operated to apply pressure to the Republic—which this Court dubbed a "uniquely recalcitrant debtor."  *NML II*, 727 F.3d at 247; *see also* NML Br. at 18, Case No. 08 Civ. 6978, Doc. 361 (Jan. 6, 2012) ("Hemmed in, in this way . . . the Court might persuade Argentina that it must deal fairly with *all* its creditors . . . pav[ing] the way to a global resolution of this protracted dispute.").

That is no longer today's world.  The Republic has now promised to take (and has taken) meaningful action to resolve its dispute with the plaintiffs in good faith.  The Injunctions are thus no longer needed to bring Argentina to the bargaining table.  Instead, they operate as an *impediment* to the resolution of this

39

dispute by allowing non-settling parties to obstruct settling parties and preventing the Republic from raising needed funds. The equities, in short, have flipped. To leave the Injunctions in place under these circumstances would convert them from a permissible equitable remedy into an impermissible and inequitable "instrument of wrong," (SPA-63), in at least two critical ways.

*First*, leaving the Injunctions in place would impede resolution of this dispute by preserving a legal obstacle to most of the settlement agreements that that Republic has reached. Plaintiffs concede this. (*See, e.g.*, A-1645 ("NML appreciates that any such resolution must include the dissolution of the pari passu injunctions entered in NML's actions.").) Indeed, as noted above, most of the agreements recently entered by the Republic and FAA bondholders expressly require as a precondition to settlement that the Injunctions will be vacated. For example, the district court pointed to the Republic's nearly $1 billion settlement with EM Limited, finding that "[i]f another plaintiff, armed with an injunction in a different action, could scupper that deal, EM—as a third party to that action— would suffer." (SPA-65.) The court explained that it "never intended this result," and that the Injunctions should thus be lifted "in all cases." (*Id.*)

If the district court acted within its discretion in determining that the Injunctions were necessary to promote resolution of this dispute—as this Court twice affirmed—surely the same district court was within its discretion to conclude

40

that vacating the Injunctions was necessary to avoid undermining its own intended result.  As plaintiffs themselves explained to this Court in 2012, "[i]t is difficult to conceive of any case in which deference to the discretion of the district court is more appropriate than it is here," where "[t]he same district judge, with nearly three decades of experience on the federal bench, presided over dozens of similar lawsuits against Argentina for more than one of those decades."  Case No. 12-105-cv(L), Doc. 308 at 69-71.  In considering the equitable solution under the present circumstances, the district court brought to bear its "indepth familiarity with the parties, counsel, and facts," having "borne witness to virtually every development in the evolving disputes arising from Argentina's 2001 default" and having "extensively examined the arguments and written more than 100 opinions and orders [in this dispute]," many of which favored plaintiffs.  *Id.* at 71.  In short, the same considerations plaintiffs urged on this Court in 2012 in support of deference to the district court's discretion apply with equal force here.

*Second*, the district court correctly found that leaving the Injunctions in place would hinder resolution of this dispute by preventing the Republic from accessing global capital markets to raise the money necessary to fund the settlements.  The district court concluded that "[a]llowing the Republic to reenter the capital markets," as part of a framework for resolution, would provide a direct and immediate benefit to the Argentine economy and the Argentine people, and

41

that restoring that access weighed in favor of vacating.  (SPA-66.)  Similarly, the court found that the Republic's "need for time to raise the capital required to pay plaintiffs with whom it has reached agreement" was a factor giving rise to "a pressing need for certainty and finality."  (SPA-82-83.)  It was comfortably within the district court's discretion to determine that the Republic's need to access international capital markets shifted the balance in favor of vacatur.

It is no answer to say, as some plaintiffs do, that the Republic could pay settlements with foreign reserves held by the Argentine Central Bank.  *See NML Br. at 41-44.*  The Central Bank's international monetary reserves are used for a variety of purposes, most importantly to support the exchange rate of the Argentine peso.  Moreover, this Court has previously held that the Central Bank is legally separate and not liable for the debts of the Republic.  *See EM Ltd. v. Banco Cent. de la República Argentina*, 800 F.3d 78, 96 (2d Cir. 2015) (*cert. pending*) (ordering dismissal with prejudice of plaintiffs' alter ego complaint against the Central Bank).  And the Republic's success in raising relatively small amounts of money in its *domestic* capital markets is hardly proof that it could tap those markets again to raise the funds needed to finance its significant payments to the settling parties.

Plaintiffs' suggestion that they know more about Argentina's fiscal needs than Argentina does is contradicted not only by common sense but by the

42

agreed-upon terms of their settlement agreement. Section 7 of the NML

Agreement provides: "The parties contemplate that to fund the payments to the

Plaintiffs . . . the Republic of Argentina . . . *will undertake one or more capital-*

*raises*, likely in the form of a bond offering." (A-2368 (emphasis added).) Indeed,

the agreement then sets forth detailed provisions concerning that expected capital

raise, including that "the first moneys raised . . . through capital-raises" will be

paid to lead plaintiffs, and that lead plaintiffs "shall not attach, or attempt to attach,

or enjoin  . . . a capital-raise that is made by the Republic." (A-2368-69.)

It also ignores the political realities in the Republic. Settlement of this

litigation, which requires the support of a Congress in which President Macri's

party does not hold a majority, is key to a broader package of economic reforms

that depend upon Argentina's ability to restore its credit in the global economy.

That political reality is embodied in the bill that has passed the lower house of

Congress, which conditions Congressional approval of the agreements in principle,

continuing negotiations, and a $12.5 billion capital raise on the district court's

order being affirmed in this appeal. Based on its extensive experience and

understanding of the case, the district court crafted an order to navigate those

complexities. This is the antithesis of an abuse of discretion.

Plaintiffs' primary response is that the Injunctions should not be lifted

until the Republic actually *consummates* the settlements in principle and thus

43

conclusively resolves the claims.  *See* NML Br. at 34 ("None of [the circumstances] has changed, and none of it *will* change until Argentina fulfills its obligations under the AIP and the agreements that others have entered into by making the agreed-to settlement payments.").  NML argues that "[d]issolution of all plaintiffs' Injunctions," including those that have not settled, "could not possibly be appropriate in the absence of Argentina actually resolving the vast majority of claims pending before the district court, adhering to its commitments, and demonstrating a good-faith effort to resolve the remaining claims, including through robust negotiations."  NML Br. at 47.

That is not the required showing, but even if it were (and any conclusion to the contrary were an abuse of discretion), the Republic *has* reached agreements to "resolv[e] the vast majority of claims pending before the district court," it *has* "demonstrat[ed] a good-faith effort to resolve the remaining claims," and it *has* imposed on itself the requirement that it "adher[e] to its commitments" by making actual payment to plaintiffs of more than $6.2 billion before the Injunctions can be vacated.

Moreover, plaintiffs' argument ignores the critical fact that the settlement agreements cannot be "consummated" without certainty that the Injunctions will be vacated upon payment.  NML Br. at 24, 29.  Otherwise, as explained above, the Republic will be unable to access the international capital

44

markets to fund the required settlement payments. There was certainly no abuse of discretion in declining to adopt such a circular and self-defeating approach.[16]

Plaintiffs' proposal also is unworkable given the practical realities of the other condition precedent to vacatur—namely, certain legislative actions by the Argentine Congress. As noted above (at 20-21), the bill that was passed by the lower house on March 15, 2016, (a) repeals the Lock Law and the Sovereign Payment Law; and (b) conditions the lifting of other impediments to settlement upon the affirmance of the district court's order to vacate the Injunctions. In other words, absent certainty that the payment of settlements will also relieve Argentina from the crippling effects of the Injunctions, the Congress—where President Macri's party does not hold a majority in either house—is not willing to authorize those payments.

In exercising its discretion, the district court showed a deft hand in navigating the situation such that all of these interrelated requirements—Congressional action, raising of capital, payment of settlements and lifting of the Injunctions—fit together to achieve a global resolution. Plaintiffs' proposed alternative recognizes none of these practical realities.

---

[16] Assertions that the Republic has not yet purged the district court's contempt orders (NML Br. at 9) are similarly without merit because, for the Injunctions to be lifted, the Republic also must repeal the Sovereign Payment Law, which would resolve the contempt order.

45

**2.  The district court did not abuse its discretion in concluding that the public interest favors vacating the Injunctions.**

The public interest is a critical component of the balance of equities that a district court may consider in exercising its equitable discretion. *NML I*, 699 F.3d at 261.  Here, the district court concluded that conditional vacatur of the Injunctions would serve the public interest for several reasons, none of which was an abuse of discretion or even seriously contested.

*First*, the court held that "[v]acating the injunctions would serve the public interest by ceasing the collateral effects they have on third parties," most notably including the Exchange Bondholders, but also including certain FAA bondholders and the Argentine people.  (SPA-64.)  The court found that, after "nearly two years" without payment to Exchange Bondholders, "it is in the public interest for the Republic to resume paying its restructured debt."  (SPA-65.)

*Second*, the court found that vacating the Injunctions and "[a]llowing the Republic to reenter the capital markets will undoubtedly help stimulate its economy and thus benefit its people."  (SPA-66.)  In considering the public interest, the court correctly recognized that it had "discretion to consider 'the health of the nation' when considering appropriate remedies."  (*Id*.)

*Third*, citing the "strong judicial policy in favor of settlements," the court held that "vacating the injunctions serves the public interest by encouraging

46

settlement to resolve disputes generally—particularly such protracted ones—as well as the concern for finality in this particular litigation." (*Id*.)

Plaintiffs argue that "none of the harms identified . . . warrants vacatur of the Injunctions" because "many of the 'harms' identified by the district court were considered by this Court and rejected as a basis for denying equitable relief." NML Br. at 41. But the fact that the district court found the public interest to be served by injunctive relief in 2012 and 2015 does not preclude it from finding that, due to the changed circumstances, the public interest is best served *today* by conditional vacatur of the Injunctions.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN VACATING THE INJUNCTIONS UPON THE OCCURRENCE OF CONDITIONS PRECEDENT.

The district court vacated the Injunctions subject to two clearly articulated conditions precedent: (i) the Republic repeal the Lock Law and related legislation that now prevents the Republic from making settlement payments to plaintiffs; and (ii) the Republic make payment in full to any parties who reached settlements by February 29, 2016, the day before the March 1 submission of the matter to the Argentine Congress. (SPA-84.) The NML plaintiffs—and, notably, *only* the NML plaintiffs—contend that the district court's decision to vacate the Injunctions is procedurally improper because it will take effect automatically upon

the occurrence of two conditions precedent.[17]  That argument is both forfeited and wrong.

As an initial matter, NML did not raise this objection before the district court and therefore has forfeited it for purposes of this appeal.  *See Gwozdzinsky v. Magten Asset Mgmt.*, 106 F.3d 469, 472 (2d Cir. 1997) ("[W]e will not decide an issue on appeal not first presented to the district court.").  In its district court briefing, NML did not even mention the existence of the conditions until page 15, and nowhere did it contend that conditional vacatur was procedurally improper.  *See generally* No. 08 Civ. 6978, Doc. 874.  Nor did NML raise this issue at the hearing held in the district court on March 1.  Indeed, at that hearing, counsel for NML announced that he had "only one point to make," which was that the district court should "allow just 30 additional days . . . before it takes any action to vacate the injunction."  (A-2271, 2273.)

---

[17] The non-party Foreign-law Bondholders do not appear to challenge the district court's authority to issue such an injunction, but they argue that doing so under these particular circumstances is inappropriate given their purported anticipated dispute as to whether the conditions will have been satisfied.  *See* Foreign-Law Bondholder Br. at 15-16.  While those bondholders submitted offers to settle by February 29, the Republic has not accepted those offers because they include claims that the Republic believes are time-barred.  As discussed above (*see supra* Section I.B.1), this Court need not wade into the merits of that issue, which is not on appeal and has no bearing on whether the district court abused its discretion in ordering the Injunctions conditionally vacated.

48

More fundamentally, NML's argument is wrong as a matter of law. NML does not cite a single authority to support its purported rule against "springing" vacatur of an injunction. That is unsurprising, because this Court has explained in this very case that a district court "empowered to afford equitable relief may also direct the timing of that relief." *NML II*, 727 F.3d at 241. The form and timing of the district court's Injunctions are well within its broad equitable discretion.

This Court has held that district courts may issue injunctions that expire or lose effect upon the satisfaction of specified conditions. In *United States v. Diapulse Corporation of America*, for example, this Court affirmed an order prohibiting the appellant from shipping a particular machine in interstate commerce "until the labeling meets the standards of the Food, Drug, and Cosmetic Act," which was a self-executing "condition for the lifting of the injunction." 457 F.2d 25, 26, 29 (2d Cir. 1972); *see also Semmes Motors v. Ford*, 429 F.2d 1197, 1207-08 (2d Cir. 1970) (affirming injunction prohibiting defendant from making contacts with plaintiff's customers until termination of related litigation).

District courts within this Circuit also have issued injunctions that are dissolved upon the satisfaction of specific, court-ordered conditions, without the need for further judicial review. *See Abbo-Bradley v. City of Niagara Falls*, 293 F.R.D. 401, 409-10 (W.D.N.Y. 2013) (enjoining environmental sampling

49

unless plaintiffs provide defendants four days' advance notice, "contemporaneous access to samples," and "an opportunity to take split samples"); *Lewis v. Rahman*, 147 F. Supp. 2d 225, 238 (S.D.N.Y. 2001) ("Defendant Hasim Rahman is hereby enjoined from engaging in any heavyweight bout for the next 18 months unless and until he complies with his contractual obligation to fight a rematch with Lennox Lewis . . . ."); *HMI Mech. Sys. v. McGowan*, No. 99-CV-376 (FJS), 2000 U.S. Dist. LEXIS 21231, at *13 (N.D.N.Y. Mar. 8, 2000) ("[T]he preliminary injunction . . . is lifted, conditional on the [Department of Labor] sending the aforementioned cover sheet and extending the deadline for the grace period.").

The two unpublished decisions cited by NML actually support the Republic's position. In *United States v. Affectionate Heart in Home Care*, No. 14-cv-2106 (ELH), 2014 WL 4953748 (D. Md. Sept. 8, 2014), the court issued an injunction requiring the defendant to pay certain taxes and held that the injunction "shall automatically dissolve in five (5) years from the date of the entry of this Order if Defendants remain in compliance with the terms of the injunction." *Id.* at *2. Similarly, in *McPherson v. Homeward Residential*, No. C12-5920 (BHS), 2013 WL 4498695, at *2 (W.D. Wash. Aug. 21, 2013), the court entered an injunction requiring plaintiffs to make specified monthly payments, and providing that the "injunction shall dissolve (1) automatically if [plaintiffs] fail to make monthly deposits or (2) [upon] further order of the Court." Like the order at issue

here, the courts in both actions entered injunctions that dissolved automatically and without further judicial action once certain events had taken place.

NML's objection appears limited to a concern that there could be some ambiguity about whether the conditions precedent have been satisfied. Once again, however, NML cites no law for the proposition that *potential* future ambiguity about the satisfaction of a condition precedent forecloses lifting the injunction. Indeed, such an objection could have been raised in any number of the cases above. In fact, this Court has made clear that the mere "possibility" of a future dispute with respect to an injunction "is not a ground for us to reverse or vacate the injunction for abuse of discretion." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 400-01 (2d Cir. 2004). "Rather, should the forecast circumstance arise, defendants may seek appropriate relief." *Id.*; *see also NML II*, 727 F.3d at 246, 248 (rejecting "speculative" or "hypothetical" objections to injunctive relief).

Moreover, the conditions are simply not ambiguous. Contrary to NML's contention that the legislative condition is "rife with the potential for factual disputes," and its attempts to conjure up hypotheticals (what if Congress enacted "some other legislation that itself was a 'legislative obstacle to settlement'?") (NML Br. at 28), it will be obvious when the "legislative obstacles to settlement" will have been abrogated because the Republic will begin paying

51

settlements, including to them (and it will be widely reported in the press).

Similarly, there can be no ambiguity as to whether the Republic has made "full

payment" on the settlement agreements reached by February 29. To do that, the

Republic simply needs to look at the amounts specified under "Settlement

Amount" in each agreement it has entered into, pay that amount, and then advise

the Court that it has done so. (*See, e.g.*, A-1973 (defining "Settlement Amount" as

"USD $963,437").)

   In all events, the district court expressly stated that it was retaining

jurisdiction to "allay any concern that the Republic will return to its old ways."

(SPA-63.) And this Court has made clear that "a district court always retains the

power to adjust the terms of an injunction as unforeseen problems or complexities

. . . present themselves." *NML II*, 727 F.3d at 246. The district court's decision to

make the relief effective automatically upon the satisfaction of two clearly defined

conditions precedent with an option for subsequent review, as opposed to ordering

some alternative sequence, is quintessentially within the court's "considerable

latitude in fashioning the relief." *NML I*, 699 F.3d at 261.

## III. THE *PARI PASSU* CLAUSE DOES NOT REQUIRE THE CONTINUED IMPOSITION OF EXTRAORDINARY EQUITABLE RELIEF IN THE FACE OF CHANGED CIRCUMSTANCES.

### A. Equitable Relief Is Not an Entitlement of Parties Aggrieved by Breach of Contract.

An injunction is not available for a breach of contract (or any similar claim for money damages) except under "extraordinary circumstances." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal citation omitted); *see also Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."). When considering the Injunctions at issue here, both this Court and the district court found that the equities favored such drastic relief at the time they were imposed because, among other things, Argentina had engaged in an "unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to Plaintiffs." *NML I*, 699 F.3d at 255-56. As the district court noted when the Injunctions first issued, they were put in place "not literally to carry out the *Pari Passu* Clause," *NML Capital v. Argentina*, No. 08 Civ. 06978 (TPG), 2012 WL 5895786, at *3 (S.D.N.Y. Nov. 21, 2012), but to address the Republic's extraordinary conduct.

Indeed, appellants have acknowledged that the Injunctions were fashioned by the court as a remedy for the Republic's past behavior, not to require actions that were already required by the FAA. As this Court previously observed,

53

NML's position has always been that "ratable payments [are] a *remedy* for Argentina's breach of the [*pari passu*] Provision," not that the clause "require[s] ratable payments." *NML I*, 699 F.3d at 259 n.10. Now that the behavior requiring a remedy has been ceased, however, appellants have reversed course. Because the Injunctions can no longer be justified on the basis of the Republic's current conduct, appellants must, and now do, argue that they have a positive right to the Injunctions. They do not have such a right, and this argument must be rejected.

### B. The *Pari Passu* Clause Does Not Require That All Bondholders Be Treated the Same in All Circumstances.

In its prior decisions, this Court articulated the limits of what the *pari passu* clause requires and what it does not. The *pari passu* clause prohibits creating and servicing new classes of debt superior to the FAA Bonds. *Id.* at 259. In holding that the Republic breached this clause, this Court emphasized that the Republic stated in SEC filings "that it ha[d] classified unexchanged FAA Bonds as a category separate from its regular debt" and had "declared in the prospectuses associated with the exchange offers that it ha[d] no intention of resuming payments on the FAA Bonds." *Id.* at 254, 260. Thus, the Republic "effectively ha[d] ranked its payment obligations to the plaintiffs below those of the exchange bondholders." *Id.* at 259.

This Court has also been clear about what the *pari passu* clause does *not* require: "we have not held that a sovereign debtor breaches its *pari passu*

54

clause every time it pays one creditor and not another, or even every time it enacts a law disparately affecting a creditor's rights." *NML II*, 727 F.3d at 247. Rather, this Court "simply affirm[ed] the district court's conclusion that Argentina's extraordinary behavior was a violation of the particular *pari passu* clause found in the FAA." *Id.* That extraordinary behavior has ceased.

In contrast to the issuance of the Exchange Bonds, which constituted a new class of debt functionally senior to the FAA Bonds, the Republic currently is not seeking to subordinate the FAA bonds or relegate them to an inferior class. Rather, the Republic is seeking to settle and make payments with respect to all outstanding claims under the FAA Bonds. It has made a general proposal to all holders of FAA Bonds, which remains open, and has been actively negotiating with individual bondholders to reach agreements and will continue to do so. And while those agreements and related settlements have not been identical, the *pari passu* clause does not require them to be. Parties are free to negotiate whatever settlement terms they find acceptable and one party's acceptance of specific terms does not prejudice other FAA bondholders. Every FAA bondholder is free to accept the general proposal or separately negotiate with the Republic, which has

been authorized by Congress to continue negotiating without the limits imposed by the Lock Law.[18]

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO ENTERTAIN THE DISINGENUOUS "CLARIFICATION" PROPOSED BY "LEAD PLAINTIFFS."

Finally, this court should reject the argument advanced by Aurelius that the district court abused its discretion by refusing to "clarify" that, if "lead plaintiffs" elected to terminate their settlement agreement, the Injunctions would remain in place, unless the Republic nevertheless paid them under the terminated agreement. (*See* Aurelius Br. at 39-49.)

Under their agreement in principle, "lead plaintiffs" negotiated the right to terminate the agreement if the Republic does not make payment in full by April 14, 2016. Within hours after entering into that $4.6 billion settlement agreement, however, they unexpectedly renewed their opposition to the Republic's

---

[18] Similarly, the Court should reject the contention of Arag-A and others (*see* Arag-A Br. at 33-36) that the settlement payments or the Republic's Proposal are discriminatory and thus violate the *pari passu* clause. *See NML I* at 259 n.10 (rejecting argument that pari passu clause violated by arms'-length repurchases by the Republic of FAA bonds "at a discount or premium"). Payments in settlement of these actions, involving the dismissal of lawsuits, release of claims and, in many instances, foregoing collection of judgments, involve more than mere "payment obligations of the Republic under the Securities" as described in the *pari passu* clause. Likewise, the Republic's Proposal is an offer to settle claims and judgments, and not simply a commitment to make payments on the FAA bonds.

motion, asking—despite the time pressure inherent in the April 14 deadline—that the district court "defer entry of any order" vacating the Injunctions. (Mar. 7 Paskin Decl., Ex. D at 3.) Then, at the hearing before the district court on March 1, "lead plaintiffs" asked "to postpone any order vacating the injunctions" for "just 30 additional days." (A-2273.) With the time required for an appeal (which the "lead plaintiffs" went on to file), that delay would have made it practically impossible for the Republic to comply with the April 14 deadline.

Meanwhile, "lead plaintiffs" also asked the district court for what they term a "ministerial clarification" (Aurelius Br. at 43) that, "if Plaintiffs do not receive full payment in accordance with the specific terms of the AIP for any reason, *including if Plaintiffs terminate the AIP on or after April 14* . . . the Injunctions shall remain in place." (A-2312 (emphasis added).) Had the district court entertained that "clarification," their position was that "if the AIP is terminated [by plaintiffs], the Order could not take effect, and the Injunctions could not be vacated." (Aurelius Br. at 42-43.) Indeed, lead plaintiffs contend that the *terminated* agreement would somehow "remain an 'agreement[] in principle with the Republic [entered into] on or before February 29, 2016'," under the terms of the district court's order, "pursuant to which payment must be made in order for the Injunctions to be vacated." (*Id.* at 46.) In other words, under this purported

"clarification," the Republic still would have to pay them $4.6 billion under a terminated contract or else the Injunctions would remain in place.

In sum, immediately after entering into their $4.6 billion settlement agreement, "lead plaintiffs" filed a motion that effectively would have prevented their counterparty from complying with its obligations under the contract. Then they tried to turn the Republic's inability to comply into a weapon that would enable them, at their option, to "scupper" all other plaintiffs' settlements and return this litigation to an impasse, or (more likely) to continue to use the Injunctions as a tool to extract yet more profits for themselves. The district court properly declined to go along with that inequitable conduct, and this Court should too. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814 (1945) (holding that "the doors of a court of equity [are closed] to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief").

*First*, if what "lead plaintiffs" are asking for is truly a "ministerial clarification," then the district court's refusal to issue such a clarification is not appealable. *See Aurelius Capital Master v. Argentina*, No. 14-2689, Doc. 167 at 2 (2d Cir. Sept. 19, 2014) (refusing jurisdiction because "the Order appealed from [was] a clarification, not a modification" of the previous order); *see also Aevoe Corp. v. AE Tech Co., Ltd.*, 727 F.3d 1375, 1380 (Fed. Cir. 2013) (an "order interpreting or enforcing an injunction . . . is generally not appealable"); *United*

58

*States v. Philip Morris USA Inc.*, 686 F.3d 839, 845-46 (D.C. Cir. 2012)

("clarification" of an injunction is not appealable).[19]

      *Second*, "lead plaintiffs'" challenge is not ripe for review.  Their

alleged injury—that Argentina will not comply with its payment obligations—is

wholly hypothetical.  *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A

claim is not ripe for adjudication if it rests upon contingent future events that may

not occur as anticipated, or indeed may not occur at all.").  Argentina intends to

comply with its obligations under the NML Agreement, and to make the required

payment by April 14, if affirmance by this Court comes in time to permit it to do

so.  *See supra* Section I.C.1.  Regardless, "lead plaintiffs" have the power to avoid

any such future injury by refraining from exercising their option to terminate—*i.e.*,

by accepting payment of their $4.6 billion in settlement consideration even if, for

some reason, that cannot be accomplished by April 14.  *Cf. NML II*, 727 F.3d

at 246 (rejecting argument based on potential consequences that are "speculative,

hyperbolic, and almost entirely of [one party's] own making").

---

[19] *United States v. McGinn*, 787 F.3d 116 (2d Cir. 2015) is not to the contrary. *McGinn* did not concern injunctive relief or even civil litigation, but instead remanded a criminal action for the limited purpose of revising the text of a restitution order to confirm the interpretation the district court had already announced. *Id.* at 131.

59

*Third*, rejecting the proposal advanced by "lead plaintiffs" was entirely within the district court's discretion.  Regardless of what they may call it, substantively, what they were asking for is a dramatically different order from the one the district court found equitable to enter—one that would have made a multi-billion dollar payment to "lead plaintiffs" a precondition to vacatur of the Injunctions even if they terminated their settlement agreement.  Of course, contract law and common sense both dictate that if an agreement is terminated the parties no longer have any obligations to each other at all—in this case, the Republic would not be obligated to make payment and "lead plaintiffs" would not be obligated to provide a release or to dismiss their claims.  The district court's refusal to entertain their proposed language is conclusive evidence that the court did not intend its order to be read in such a way as to contravene basic contract principles.

Moreover, the proposed "clarification" is contrary to the text of the district court's order, which requires that settlements be paid "in accordance with the specific terms of each such agreement."  (SPA-84.)  The "specific terms" of the NML Agreement provide, in bold letters, that "[i]n the event that this Agreement in Principle is terminated as to any or all Plaintiffs" it shall be "as if there had been no Agreement in Principle."  (A-2371.)  The application of the district court's order in that event is clear—no settlement payment will be owed, and thus such payment will not be a condition to vacatur of the Injunctions.

60

Needless to say, this is unusual behavior for parties that have already reached a settlement, and if their goal is to coerce yet more profits for themselves—or, even worse, to "scupper" the entire global settlement and return this 15-year-old dispute to an intractable impasse—the Republic respectfully submits that the district court acted within its discretion in concluding that the equities did not support such a "clarification."

## CONCLUSION

For the foregoing reasons, the Order of the District Court should be affirmed.

March 21, 2016

BANCROFT PLLC,                          CRAVATH, SWAINE & MOORE LLP,

  by                                        by

      /s/ Paul D. Clement                       /s/ Michael A. Paskin
      Paul D. Clement                           Daniel Slifkin
      Jeffrey M. Harris                         Michael A. Paskin
      Christopher G. Michel                     Damaris Hernández

      500 New Jersey Avenue NW                  Worldwide Plaza
      Seventh Floor                             825 Eighth Avenue
      Washington, DC 20001                      New York, NY 10019
      (202) 234-0090                            (212) 474-1000

*Attorneys for Defendant-Appellee The Republic of Argentina*

61

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,958 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 2007 in 14-point Times New Roman.

March 21, 2016

/s/ Michael A. Paskin
Michael A. Paskin