# 16-628(L)

**16-639(CON), 16-640(CON), 16-641(CON), 16-642(CON), 16-643(CON), 16-644(CON), 16-649(CON), 16-650(CON), 16-651(CON), 16-653(CON), 16-657(CON), 16-658(CON), 16-659(CON), 16-660(CON), 16-661(CON), 16-662(CON), 16-664(CON), 16-665(CON), 16-666(CON), 16-667(CON), 16-668(CON), 16-669(CON), 16-670(CON), 16-671(CON), 16-672(CON), 16-673(CON), 16-674(CON), 16-675(CON), 16-677(CON), 16-678(CON), 16-681(CON), 16-682(CON), 16-683(CON), 16-684(CON), 16-685(CON), 16-686(CON), 16-687(CON), 16-688(CON), 16-689(CON), 16-690(CON), 16-691(CON), 16-694(CON), 16-695(CON), 16-696(CON), 16-697(CON), 16-698(CON)**

## United States Court of Appeals
### FOR THE SECOND CIRCUIT
### Docket No. 16-628(L)

AURELIUS CAPITAL MASTER, LTD., *et al.*,

*Plaintiffs-Appellants*,

—v.—

REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA AS *AMICUS CURIAE*

BENJAMIN C. MIZER,
*Principal Deputy Assistant Attorney General*

DOUGLAS N. LETTER,
SHARON SWINGLE,
*Attorneys, Appellate Staff Civil Division, Department of Justice*

PREET BHARARA,
*United States Attorney for the Southern District of New York, Attorney for the United States of America as Amicus Curiae*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2678

JEANNETTE A. VARGAS,
BENJAMIN H. TORRANCE,
*Assistant United States Attorneys, Of Counsel.*

## TABLE OF CONTENTS

PAGE

Interest of the United States. . . . . . . . . . . . . . . . . . . . 1

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

POINT I—The District Court Had Broad Discretion
   to Modify Its Injunction in Light of Changed
   Circumstances and the Public Interest . . . . . . . 9

POINT II—Vacatur of the Injunctions Is in the
   Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ii

## TABLE OF AUTHORITIES

*Cases:*

*Badgley v. Santacroce,*
    853 F.2d 50 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . 10

*Brown v. Plata,*
    131 S. Ct. 1910 (2010). . . . . . . . . . . . . . . . . . . . . . 10

*Davis v. New York City Housing Auth.,*
    278 F.3d 64 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . 10

*Horne v. Flores,*
    557 U.S. 433 (2009). . . . . . . . . . . . . . . . . . . . . . . . 13

*N.Y. State Ass'n of Retarded Children, Inc.*
    *v. Carey,*
    706 F.2d 956 (2d Cir. 1983) . . . . . . . . . . . . . . . . . 10

*NML Capital, Ltd. v. Banco Central de la*
    *República Argentina,*
    652 F.3d 172 (2d Cir. 2011) . . . . . . . . . . . . . . . . . 5

*NML Capital, Ltd. v. Republic of Argentina,*
    699 F.3d 246 (2d Cir. 2012) . . . . . . . . . . . . . 5, 6, 7

*NML Capital, Ltd. v. Republic of Argentina,*
    727 F.3d 230 (2d Cir. 2013) . . . . . . . . . . . . . . . . . 7

*NML Capital, Ltd. v. Republic of Argentina,*
    No. 08 Civ. 6978, 2016 WL 836773
    (S.D.N.Y. Mar. 2, 2016) . . . . . . . . . . . . . . . . . . . . 1

*Rufo v. Inmates of Suffolk County Jail,*
    502 U.S. 367 (1992). . . . . . . . . . . . . . . . . . . . . . . . 10

iii

PAGE

*Salazar v. Buono,*
    559 U.S. 700 (2010) . . . . . . . . . . . . . . . . . . . . . . . 10

*Sierra Club v. U.S. Army Corps of Engineers,*
    732 F.2d 253 (2d Cir. 1984) . . . . . . . . . . . . . . . . . 9

*System Fed'n No. 91, Ry. Emp. Dep't,*
    *AFL-CIO v. Wright,*
    364 U.S. 642 (1961) . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Eastman Kodak Co.,*
    63 F.3d 95 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . 10

*United States v. Swift & Co.,*
    286 U.S. 106 (1932) . . . . . . . . . . . . . . . . . . . . . . . 13

*Statutes*:

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 16-628(L)

———————————

AURELIUS CAPITAL MASTER, LTD., ET AL.,

*Plaintiffs-Appellants,*

—v.—

REPUBLIC OF ARGENTINA,

*Defendant-Appellee.*

———————————

## BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE

———————————

### Interest of the United States

Pursuant to 28 U.S.C. § 517 and Rule 29(a) of the Federal Rules of Appellate Procedure, the United States of America respectfully submits this brief as amicus curiae addressing an order entered by the United States District Court for the Southern District of New York (Thomas P. Griesa, J.), on March 2, 2016 (the "Vacatur Order"). *NML Capital, Ltd. v. Republic of Argentina*, No. 08 Civ. 6978, 2016 WL 836773 (S.D.N.Y. Mar. 2, 2016); (SPA 70).

The United States has significant foreign policy interests in supporting a swift resolution to this long-

2

running litigation. Vacatur of the *pari passu* injunctions is a critical step toward concluding the litigation and hastening the Republic of Argentina's ("Argentina" or the "Republic") resolution of its outstanding liability to plaintiff bondholders, allowing Argentina to emerge from default to its exchange bondholders, and facilitating its return to the international financial markets.

As discussed in more detail below, the district court's *pari passu* injunctions were issued to address Argentina's longstanding refusal to pay debts owed to bondholders who declined to participate in voluntary exchange offers in 2005 and 2010. The district court found that the plaintiff bondholders had no remedy at law due to, *inter alia*, Argentina's enactment of laws that prohibited settlement with bondholders that had not accepted the exchange offers and prohibited any settlement more favorable than the exchange offers. The district court also held that the equitable balance supported the injunctions in light of Argentina's "repeated failures" to pay plaintiffs and its "unprecedented, systematic scheme" to pay other debts without paying plaintiffs. (SPA 100).[1]

------------

[1]   The United States has previously explained to this Court that, although it did not condone Argentina's actions in previously failing to normalize relations with its private creditors, the district court's *pari passu* injunctions were based on a construction of a standard contract provision that was inconsistent with settled market understanding, and undermined longstanding U.S. efforts to promote orderly restruc-

3

Since the inauguration of Argentine President Macri in December 2015, however, Argentina has taken significant steps to normalize its relations with its creditors, including the plaintiff bondholders. Argentina has carried out good-faith negotiations with plaintiff bondholders, resulting in agreements that, according to the district court, would resolve over 85% of claims held by plaintiffs with injunctions against Argentina. (SPA 83). The Republic has abandoned all former legal challenges to the *pari passu* injunctions, and has urged the Argentine Congress to approve the settlements. (*Id.*). The opposition-party-led Argentine Lower House of Congress passed legislation March 15, 2016, that would authorize settlement with the plaintiffs. The Argentine Senate is ex-

───────────

turing of sovereign debt. *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105, Brief for the United States of America as *Amicus Curiae* in Support of Reversal (2d Cir. filed Apr. 4, 2012). Furthermore, the injunctions were an extraordinary remedy for breach of contract, the remedy for which would normally be money damages rather than injunctive relief. Finally, the district court's injunctions, in seeking to restrain a sovereign state's disposition of assets that are not subject to execution under the Foreign Sovereign Immunities Act, were inconsistent with that statute and also threatened harm to U.S. foreign relations. Although this Court affirmed the district court's *pari passu* injunctions, the United States continues to believe, both as a legal matter and for policy reasons, that they were deeply problematic.

4

pected to vote on the bill for final approval by March 30, 2016.

Vacatur of the *pari passu* injunctions is in the public interest. The United States has a significant interest in the orderly and cooperative resolution of sovereign debt defaults. The *pari passu* injunctions, however, stand in the way of the effectuation of many of the agreements in principle that have been reached by the parties. Vacatur is a precondition for the effectiveness of many of the agreements. Moreover, failure to vacate the injunctions could well prevent the consensual resolution of the remaining creditors' claims because holdout creditors could use the injunctions as leverage to prevent payment to those plaintiff bondholders that have entered into agreements in principle.

The United States also has a significant foreign policy interest in supporting Argentina's new administration's efforts to reverse prior economic policies, to normalize Argentina's relations with its creditors, and to strengthen the Argentine economy. As described in more detail below, the failure to vacate the *pari passu* injunctions could have serious consequences for the Argentine economy and for U.S. policy interests in the region more generally.[2]

---

[2] Certain of the plaintiffs-appellants have raised various procedural arguments regarding the Vacatur Order. The United States takes no position on those issues.

5

## Background

In 2001, Argentina announced a moratorium on its repayment of approximately $80 billion in public foreign debt securities. *See NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 175 (2d Cir. 2011). Argentina restructured approximately 92 percent of its debt by launching global exchange offers in 2005 and 2010, pursuant to which creditors holding the defaulted bonds could exchange them for new securities with modified terms. *Id.* at 176 & n.4. Plaintiffs here did not accept the exchange offers and instead sought recourse from the courts.

Some of the plaintiffs here obtained default judgments against Argentina in other actions, and sought to enforce those judgments. However, Argentina refused to pay the judgments. Furthermore, a 2005 law enacted by the Argentine legislature, and continued in force except for during the 2010 global exchange offer—the so-called "Lock Law"—provided that the Argentine Executive "may not . . . reopen the swap process" and that "[t]he national State shall be prohibited from conducting any type of in-court, out-of-court or private settlement with respect to the bonds" that had not been exchanged in the global exchange offer. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 252 (2d Cir. 2012). Plaintiffs accordingly brought suit against Argentina, contending that Argentina's refusal to pay its outstanding debts while making payments on exchange bonds, and its enactment of the Lock Law, violated the "*pari passu*" clause in its debt agreement and debt instruments. The relevant provision in the debt agreement provid-

6

ed that the bonds "shall at all times rank *pari passu* without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness . . . ." *NML Capital*, 699 F.3d at 251 (emphasis omitted).

By orders dated February 23, 2012, November 21, 2012, and October 30, 2015, the district court entered a series of injunctions (the "*pari passu* injunctions") against Argentina. (SPA 1, 9). As the district court recognized, "an injunction is an extraordinary measure that is not normally available for breach of contract." (SPA 117). The injunctions entered in this case are even more extraordinary in their scope and breadth, for not only are they directed at a sovereign state, they require Argentina to pay the full amount due to the plaintiff creditors whenever Argentina makes a payment under the terms of the 2005 and 2010 exchange bonds. (SPA 4-5). The district court further prohibited third parties from assisting Argentina in servicing payments on the exchange bonds unless full payment of the outstanding amount due to the plaintiff creditors under the defaulted bonds is also made. (SPA 5). Finally, the district court prohibited Argentina from altering the process by which Argentina makes payments on the exchange bonds without obtaining approval from the court. (SPA 7).

The district court's justification for granting plaintiffs such unprecedented relief was that Argentina had "codified [into law] its intention to defy any money judgment issued by this Court" by enacting the

7

Lock Law and had "engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to" the plaintiff creditors. (SPA 3).

This Court affirmed the injunctions, holding that the issuance of the injunctions was not an abuse of discretion. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012); *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013). In so ruling, the Court made clear that its decision was based not on any single Argentine action, but on the entirety of Argentina's unique "course of conduct," as described in the district court's opinion. *NML Capital*, 699 F.3d at 264 n.16.

In October 2014, the district court held Argentina in contempt for violating the *pari passu* injunctions by, *inter alia*, enacting the Sovereign Payment Law. (A 9730-32; A 1460-88). The Sovereign Payment Law sought to change the location for payment of amounts due under the exchange bonds to Argentina. (*Id.*). Notwithstanding the passage of this legislation, Argentina has made no payments to the exchange bondholders since the *pari passu* injunctions went into effect.

The district court has now held, exercising its equitable discretion, that "significantly changed circumstances have rendered the injunctions inequitable and detrimental to the public interest." (SPA 109). Specifically, the district court found that the circumstances that led the district court to enter the injunctions in the first instance—Argentina's refusal to acknowledge or honor its debt to the plaintiff bond-

8

holders, its refusal to negotiate in good faith about a potential settlement, its enactment of legislation that would thwart any settlement, and its ongoing efforts to pay exchange bondholders while refusing to pay plaintiff bondholders—have changed with the December 2015 inauguration of President Macri. The district court found that the Macri administration, unlike the prior administration, has "consistently declared its desire to resolve its disputes [with its creditors] and reopen the country to foreign investors." (SPA 103). The district court found that this change of policy was demonstrated not just by Argentina's public statements, but by the new government's actions.

The district court found that, starting in January 2016, Argentina's new government participated in good-faith settlement negotiations with the plaintiff creditors presided over by the Special Master appointed by the district court. (SPA 103, 110). As described in the district court's decision, Argentina reached agreements in principle with five creditor groups in early February. (SPA 103, 110). On February 5, 2016, Argentina made public a settlement proposal open to all bondholders. (SPA 103-04). The public settlement proposal, and some of the agreements in principle, have two conditions precedent: approval by the Argentine Congress, and vacatur of all the *pari passu* injunctions. (SPA 104). The district court also found that Argentina had agreed to rescind the legislative enactments blocking payments to plaintiff creditors that had led the district court to determine that Argentina was in breach of the *pari passu* clause. (SPA 111).

9

Accordingly, on March 2, 2016, the district court entered the Vacatur Order, pursuant to which the *pari passu* injunctions would be vacated upon the occurrence of two conditions precedent: (1) the repeal by the Argentine Congress of all legislative obstacles to payment of the plaintiff bondholders, including the Lock Law and the Sovereign Payment Law; and (2) full payment to all plaintiffs that reached settlements with Argentina on or before February 29. (SPA 84). The district court reasoned that vacatur of the injunctions without additional delay would permit Argentina to raise capital to pay for the settlements and would allow the settlements already reached to be consummated. (SPA 82-83). The district court also noted that it retained jurisdiction, so that the parties could return to the court in the event that Argentina proceeded in bad faith. (SPA 113).

## A R G U M E N T

### POINT I

### The District Court Had Broad Discretion to Modify Its Injunction in Light of Changed Circumstances and the Public Interest

"A district court's modification of an injunctive decree will not be disturbed on appeal, absent a showing that the court abused its discretion. . . . [I]n the case of a final or permanent injunction, the inquiry on appeal is whether there has been such a change in the circumstances as to make modification of the decree equitable." *Sierra Club v. U.S. Army Corps of*

10

*Engineers*, 732 F.2d 253, 257 (2d Cir. 1984); *see Davis v. New York City Housing Auth.*, 278 F.3d 64, 88 (2d Cir. 2002) (recognizing the "well established" principle that "a district court has the power, in the exercise of its discretion, to modify its past injunctive decrees in order to accommodate changed circumstances"). As the district court correctly recognized, "[c]ourts have 'wide discretion' to vacate injunctions." (SPA 106 (quoting *System Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 648 (1961))); *see, e.g.*, *Brown v. Plata*, 131 S. Ct. 1910, 1946 (2010) (" 'The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.' " (quoting *N.Y. State Ass'n of Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983) (Friendly, J.))). " 'Total compliance' with an injunction 'is not an absolute precondition of modification.' " (SPA 108 (quoting *Badgley v. Santacroce*, 853 F.2d 50, 54 (2d Cir. 1988))). Where equitable factors support vacatur, a district court may vacate an injunction even though " 'the purpose of the decree has not been achieved.' " (SPA 108 (quoting *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995))).

It is particularly appropriate to vacate or modify an injunction where its continued enforcement would be "detrimental to the public interest." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992); *cf. Salazar v. Buono*, 559 U.S. 700, 714 (2010) (plurality op.) ("[A] court should be particularly cautious when contemplating relief that implicates public interests.").

## POINT II

### Vacatur of the Injunctions Is in the Public Interest

The district court found that "significantly changed circumstances have rendered the injunctions inequitable and detrimental to the public interest." (SPA 109). The district court held that Argentina no longer had in place a policy of refusing to pay the bondholders that had not participated in the exchange offers, which was demonstrated by its settlement proposals, its good faith negotiations before the Special Master, and its agreement to rescind the legislative enactments that had led the district court to determine that Argentina was in breach of the *pari passu* clause. (SPA 80-81). The district court further held that the vacatur of the injunctions would serve the public interest. (*Id.*). Vacatur would end the injurious effects the injunctions had had on third parties, and would allow Argentina to re-enter the international capital markets, which would stimulate the economy and benefit the country. (*Id.*). And it would allow the settling plaintiffs to effectuate their settlements and encourage a final resolution of protracted litigation. (*Id.*). The district court's analysis of these equitable factors was clearly correct, and did not represent an abuse of discretion.

Recognizing the serious difficulties that sovereign solvency crises present for both sovereign borrowers and the international financial system, the United States has adopted, as a cornerstone of its foreign economic policy, the position that governments should embrace strong macroeconomic policies that

12

will produce economic growth, allow them to fully satisfy their external debt obligations, and strengthen the international financial system. In those rare cases where a sovereign cannot meet its external obligations, however, the policy of the United States is that the orderly and consensual restructuring of sovereign debt, in conjunction with needed macroeconomic adjustments, is the most appropriate response.

Orderly and consensual restructuring is not practicable when minority holdout bondholders can obtain an injunction preventing payments to a majority of other bondholders that have accepted restructuring. Now that agreements have been reached with respect to the vast majority of the claims of the plaintiff bondholders, keeping the injunctions in place is even more problematic. The district court properly recognized this interest in vacating the *pari passu* injunctions. The district court emphasized that "President Macri's election marked a turning point in the Republic's attitude and actions," and that "President Macri's election changed everything." (SPA 103, 109). Argentina immediately indicated its willingness to enter into settlement negotiations, and high-level government officials participated in talks with the lead plaintiffs and the Special Master. (SPA 103). During weeks of discussions, the Republic reached agreements in principle to settle with five of those plaintiffs, offering over $1.1 billion. (*Id.*). Although other plaintiffs refused to settle, Argentina publicly announced its proposal and offered to continue to negotiate with bondholders. (SPA 103-04). Notably, Argentina publicly announced its willingness to settle not only with plaintiffs who were the beneficiaries of

13

*pari passu* injunctions, but also plaintiffs who were not. (SPA 105). The United States does not take a position as to the reasonableness of Argentina's settlement offers. We note, however, that at the time the district court entered the Vacatur Order, more than 85% of the claims held by plaintiffs with injunctions were the subjects of agreements in principle with Argentina. (SPA 83). This "'dramatic shift in policy'" from Argentina's prior refusal to negotiate, the district court held, justified vacating the injunctions. (SPA 112 (quoting *Horne v. Flores*, 557 U.S. 433, 461 (2009) (ellipsis omitted))).

The district court correctly recognized that the refusal to vacate the injunctions "would unfairly deny those plaintiffs" who had agreed in principle to settlement "the opportunity to resolve their disputes amicably with the Republic." (SPA 113 (noting that the injunctions "must not be 'turned through changing circumstances into an instrument of wrong.'" (quoting *United States v. Swift & Co.*, 286 U.S. 106, 115 (1932)))). Many of the agreements in principle, and the general settlement proposal made by Argentina, are conditioned upon vacatur of the *pari passu* injunctions. Accordingly, a failure to vacate the injunctions could imperil the existing agreements in principle that Argentina has reached with its creditors. (SPA 103). The *pari passu* injunctions should not stand in the way of consensual agreements that promise to bring to a close more than fifteen years of litigation.

Moreover, as recognized by the district court, leaving the *pari passu* injunctions in place until such

14

time as all plaintiffs have reached settlements with
Argentina could "create an incentive for the remaining holdout plaintiffs to shun settlement, knowing
that they derive leverage from the ability to prevent
the Republic and the other plaintiffs from consummating agreements." (SPA 113). The remaining holdout bondholders could use the *pari passu* injunctions
as a tool to maximize their own recovery, at the expense of the majority of the settling bondholders. Enabling holdouts to pursue such litigation strategies
undermines the orderly consensual restructuring process the United States has been at pains to foster for
the past several decades. (SPA 116). The district
court properly refused to leave in a place an injunction "that would allow some plaintiffs to hold other
plaintiffs hostage." (SPA 119).

Vacating the injunctions also serves the public interest by permitting Argentina to resume payments
to the exchange bondholders, which had been stymied
by the *pari passu* injunctions, and emerge from the
2014 default on the exchange bonds. (SPA 114-15).
And it benefits other third parties affected by the injunctions, including financial intermediaries used to
pay the exchange bondholders and bondholders who
are not parties to the litigation. (SPA 114).

Vacatur of the injunctions also serves the foreign
policy interests of the United States. The issuance of
the *pari passu* injunctions caused a strain in the relations between the United States and Argentina, the
third largest economy in Latin America and a valued
G20 ally on global issues. The injunctions also gave
rise to a proliferation of problematic proposals at the

United Nations and other international forums to modify the current sovereign debt resolution system, including an attempt to create a treaty-based international sovereign debt resolution mechanism.

The United States has consistently maintained that Argentina should normalize relations with all of its creditors, both public and private. The Macri administration has made significant efforts to implement beneficial fiscal and monetary reforms, including its efforts to settle the bondholder dispute. "[I]n light of the [Argentine] government's progress on key issues and positive economic policy trajectory," U.S. Treasury Secretary Lew announced that the United States was ending its policy, in place since 2011, of opposing most lending to Argentina from multilateral development banks. (Readout from a Treasury Spokesperson of Secretary Lew's January 21, 2016, Meeting with Argentine Finance Minister Alfonso Prat-Gay). Recent and upcoming high-level engagements, including the first bilaterally focused presidential visit in almost two decades scheduled for March 23-24, 2016, recognize the dramatic policy shifts underway in Argentina.

In the view of the United States, resolution of the dispute with bondholders is crucial to the success of Argentina's economic reform agenda. Argentina's new administration inherited a large budget deficit, along with depleted international reserves. Our understanding is that the new administration intends to issue debt to pay the bondholders with whom it has reached agreements in principle, and will likely return to international bond markets later this year to

16

meet its large financing needs. Uncertainty regarding the lifting of the injunctions would, at a minimum, make raising funds more difficult.

The failure to vacate the *pari passu* injunctions and the unraveling of the agreements with bondholders could have serious consequences for the Argentine economy and for U.S. policy interests in the region more generally. Resolution should stimulate economic growth going forward, while giving the Argentine government breathing room to implement further major, positive economic reforms. In contrast, without access to international capital markets, the Argentine government risks forfeiting the strong investor and public confidence that have greeted President Macri's intention to accomplish disinflation in the context of correcting the serious macroeconomic imbalances that his government inherited. The Macri administration recently marshaled a remarkably strong majority in Argentina's opposition-led Congress in favor of repayment to creditors, on the understanding that Argentina's good faith negotiations with creditors, its constructive work with the Special Master, and the positive reception of the district court to its efforts will allow Argentina to finally turn the page on this long-running conflict by returning to markets. The district court properly considered the economic health of Argentina and its people in analyzing the equities, concluding that "[a]llowing the Republic to reenter the capital markets will undoubtedly help stimulate its economy and thus benefit its people." (SPA 116).

17

Finally, the United States has a significant, and more general, policy interest in promoting open, market-based economies and sound macroeconomic policy in Latin America. Argentina's bold macroeconomic reforms set a positive example for other countries in the region, and the success of the reform program hinges on resolution of the dispute with plaintiffs. As the district court noted, vacatur of the *pari passu* injunctions would not only recognize the Republic's significant efforts to resolve its dispute, but might "encourage other indebted nations to choose compromise over intransigence." (SPA 116). Those public interests weigh heavily in favor of vacatur.

18

## CONCLUSION

For the foregoing reasons, the vacatur of the *pari passu* injunctions is in the public interest.

Dated:     New York, New York
           March 23, 2016

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States as*
                         *Amicus Curiae.*

                    JEANNETTE A. VARGAS,
                    BENJAMIN H. TORRANCE,
                    *Assistant United States Attorneys,*
                         *Of Counsel.*

BENJAMIN C. MIZER,
*Principal Deputy Assistant Attorney General*
DOUGLAS N. LETTER,
SHARON SWINGLE,
*Attorneys, Appellate Staff*
*Civil Division, Department of Justice*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 3779 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: JEANNETTE A. VARGAS,
*Assistant United States Attorney*